## THE SARATOGA.

### (District Court, S. D. New York. June 17, 1884.)

1. **COMMON CARRIER—BILL OF LADING—EXCEPTIONS OF "NEGLIGENCE."**

    A general ship is a common carrier; an exception in her bills of lading against loss "by any act, neglect, or default of the master or mariners" is invalid.

2. **SAME—LOSS "BY THIEVES OR ROBBERS."**

    An exception against loss "by thieves or robbers" is valid, unless the theft be invited or made easy through some negligence of the ship.

3. **SAME—ORDINARY NEGLIGENCE.**

    Such an exception serves only to relieve the ship from her liability as *guarantor* against theft, and from that extreme care which naturally accompanies such a guaranty. She is still bound to use all customary and reasonable vigilance against theft, according to the nature of the articles and the temptations and facilities for stealing them.

4. **SAME—CASE STATED.**

    Where the steamer S. received on board a box of gold coin valued at $23,600, a few hours before sailing, which was put in the locker beneath the floor of the "glory-hole," in the run of the ship, and the scuttle to the locker was provided with a bar across it designed to be fastened by a padlock, and also with a stout lock in the edge of the scuttle, and the box of coin was at once put in the locker and the lock fastened, but the bar and padlock were not used or fastened, and a former discharged employe had previously gone to the glory-hole, taken out the lock, and carried it off and got a key fitted to it, and had then replaced the lock in the edge of the scuttle, and, shortly after the box was shipped, again went aboard and went to the glory-hole, unlocked the scuttle, broke open the box in the locker, stuffed the bags of coin about his waist, se-

cured them by a strap, and left the ship by the usual gang-way, unobstructed, though observed and interviewed by two seamen, who supposed him to be smuggling, *held*, that the ship was chargeable with neglect of customary, ordinary, and reasonable vigilance against the theft of the coin in not using the bar and padlock; in not providing any check or guard against access to the glory-hole; in not preventing tampering with the lock; and in not having suitable and proper watch against suspicious persons on sailing days; and in not observing and stopping a person when leaving the ship who was so visibly and plainly stuffed with his plunder.

In Admiralty.

*Butler, Stillman & Hubbard*, for libelant.

*Goodrich, Deady & Platt*, for the Saratoga.

BROWN, J. The libel in this case was filed to recover $23,600, the value of a quantity of Spanish gold coin shipped, on the twenty-seventh day of May, 1880, on board the steam-ship Saratoga, and consigned to Havana, but which was not delivered there because stolen from the steamer, as the evidence shows, before she left New York. The coin was in bags contained in a wooden box, which was strapped with iron, and was about 18 inches long, 12 wide, and 8 deep. It was received on board the steamer, as she lay at her wharf, about 1 o'clock in the afternoon, some three hours only before she sailed. It was delivered to one of the quartermasters, who immediately carried it to the locker, where it was deposited and locked up. The evidence leaves no reasonable doubt that, within an hour or two afterwards, the locker was entered by a former employe of the ship, who had been discharged on the previous voyage; that the box was broken open by him, the bags of coin stuffed around his waist; and that, with the coin about him, he went off the steamer, by the usual gangway, and in broad daylight, shortly before the ship sailed.

The bill of lading exempts the vessel from liability for loss occasioned by "pirates, robbers, thieves, * * * or from any act, neglect, or default of the master or mariners."

The defendant's vessel was a general ship, and a common carrier. The clause of the bill of lading exempting her from liability for any "act, neglect, or default of the master or mariners" is therefore invalid, and affords no defense, if the loss was occasioned through their negligence. *Railroad Co.* v. *Lockwood*, 17 Wall. 357; *Bank of Kentucky* v. *Adams Exp. Co.* 93 U. S. 174; *The Hadji*, 16 FED. REP. 861; 18 FED. REP. 459.

It is not necessary to consider the conflicting views as to the ship's liability under the exception of "thieves, robbers," etc., had the theft been committed by one of her own employes, (*Spinetti* v. *Atlas Steamship Co.* 80 N. Y. 71; *Taylor* v. *Liverpool, etc.,* L. R. 9 Q. B. 546;) nor what effect, in the consideration of that question, should be given to the principles laid down by the supreme court, in *Railroad Co.* v. *Lockwood;* since Jacques, who is satisfactorily shown to have committed the theft, was not at this time in the ship's employ, but had been previously discharged.

The exception of loss by thieves or robbers is valid, unless it be shown that there was negligence on the part of the ship which contributed to the theft or facilitated it; and upon defendant's proving that the theft was committed by a person not belonging to the ship, the burden of proof is upon the libelants to show to the satisfaction of the court that the loss might have been avoided by the exercise of reasonable and proper care on the part of the ship, and that the theft would not have occurred if such care had been exercised. If the carelessness of the ship was such as to invite the theft, or to make it easy, or if the attempt would not have been successful except through the lack of such watchfulness and care as was reasonably incumbent upon those having charge of such treasure, then the loss must be held to be occasioned by the carrier's negligence and inattention to his duty, as well as through the direct acts of the thief.

In *Clark* v. *Barnwell*, 12 How. 272, 281, the court say:

"But if it can be shown that it (the loss) might have been avoided by the use of proper precautionary measures, and that the usual and *customary* methods for this purpose have been neglected, they may still be held liable. It is competent for the libelants to show that the respondents might have prevented it (the loss) by proper skill and diligence in the discharge of their duties."

In *Transp. Co.* v. *Downer*, 11 Wall. 129, 133, the court say:

"If the danger might have been avoided by the exercise of proper care and skill on the part of the defendant, it is plain that the loss should be attributed to the negligence and inattention of the company, and it should be held liable, notwithstanding the exception in the bill of lading." See, also, *Six Hundred and Thirty Quarter Casks of Sherry Wine*, 14 Blatchf. 517; *Dedekam* v. *Vose*, 3 Blatchf. 44; *Richards* v. *Hansen*, 1 Fed. Rep. 54, 63; *The Invincible*, 1 Low. 225; *The Montana*, 17 Fed. Rep. 377.

There can be no doubt that this rule, which, upon the above authorities, is applicable to the other exceptions of the bill of lading, is equally applicable to an exception of loss through theft or robbery. The exception of loss by "robbers, thieves," etc., applies to all goods alike; but it does not, therefore, follow either that the ship is relieved of all care whatsoever against loss by theft, or that only the same kind of care is required as regards coin, or other valuables, as would be sufficient as respects ordinary merchandise. The effect of the exception is to relieve the ship as a common carrier from its liability as a *guarantor* against loss by theft; and also to relieve the ship, as I think, from that high degree of care, which may be termed extreme care, which might naturally be expected to accompany its extreme obligation as a guarantor against theft in any event. But notwithstanding the exception of theft, the ship still remains liable for all ordinary, all customary, all reasonable diligence in the care of the goods intrusted to it; having reference to the nature of the goods themselves, their liability to injury or loss, whether by theft or by any other cause, the temptations to theft, and the facility with which it may be committed. This principle is recognized and well settled in

respect to the oldest and most constant exception in bills of lading, namely, "perils of the seas." Though a loss happen from the violence of the winds or waves, it is not deemed to arise from a peril of the seas if it might have been avoided by the exercise of ordinary and reasonable human skill and vigilance. *The Reeside,* 2 Summ. 567, 571; *The Titania,* 19 FED. REP. 101. Though a loss by "breakage" be excepted, this does not authorize the handling of glassware in the same manner as goods not liable to injury by breakage; nor is it claimed that because losses by robbery and theft are excepted, valuables, such as coin, watches, or diamonds, may be stowed on board ship with no other care than that which ordinary merchandise requires. Notwithstanding any special exceptions, all goods received must be handled and stowed, or stored, according to their nature, and their liability to injury or loss. The rates of freight differ in respect to different classes of goods in consequence of the different care and trouble which they require. The freight upon this box of coin, only 18 inches long, and weighing altogether but 137 pounds, was $29.50; and the obligation to make reasonable provision for the safety of such treasure is universally recognized by providing safes or lockers to receive it. Coin is free from liability to most of the various kinds of injury to which ordinary merchandise is exposed; its peculiar danger is that of theft; the only care required in regard to it is vigilance against theft; and to protect against this danger, reasonable vigilance must still be exercised, notwithstanding the exception.

The principal facts relied on to show negligence in this case relate to the place of the locker, its imperfect fastening, and the want of reasonable watch of persons coming on board and going off the ship. The locker was a small place in the run of the ship, beneath the deck of the "glory-hole," about six feet high, six feet long, and four feet wide. It was lined with sheet-iron; and the only access to it was through a scuttle two feet square in the deck or floor of the glory-hole. The latter was a small room in the after-part of the ship, approached only through the rear of the cabin by stairs descending about six or seven feet. It was used as a sleeping-room for the waiters, and had 10 or 12 berths. The scuttle to the locker beneath was a part of the floor of this room, flush with it, and designed to be fastened by means of an iron bar extending across it, which was permanently fastened at one end, and at the other end was fastened by a padlock. In the edge of the scuttle upon one side was a heavy lock having two stout bolts projecting, when locked, into the adjoining edge of the deck or floor. There was a key-hole in the scuttle, the key of which was in charge of the purser. When the box of coin was put in this locker, the purser was called and the lock fastened. But the bar across the top was not secured by the padlock, either then or at any time during the voyage following. Before the box was placed in the locker the purser had left the key loose upon his desk or hung up in his room. His room was approached by two doors, which were usu-

ally locked when he was not present. No person acted as guard or watch over the locker, or to prevent access to the glory-hole, during the afternoon before the ship sailed. Two or three days previous Jacques had gone on board the ship under pretense of desiring to get his clothes from the glory-hole, (where he had slept prior to his discharge,) and had removed the lock from the scuttle, taken it away with him to a locksmith, had a key fitted to it, and had afterwards brought the lock back and replaced it in the scuttle. How he first removed the scuttle so as to be able to take the lock off does not appear; nor does it appear whether the scuttle was left unlocked, or whether he obtained the key for a short time from the purser's room to unlock it. Shortly after the box had been put in the locker, he for the third time came aboard the ship, having a valise with a strap about it, and went to the glory-hole under the same pretense as before. Meeting two waiters, he sent them forward to the bar with money to get some beer, and during their absence, it would seem, went down the locker, and by means of a short, pointed iron bar belonging to the ship broke open the box, removed the bags of coin, locked the locker as before, and stuffed the bags about his person, securing them by the strap which he had brought with the valise. As he came up the stern of the ship, he had a bundle wrapped in green cloth under his arm, and asked one of the seamen present if he could not get aboard a schooner off the stern of the steamer. The man offered to take the roll and pass it down to him, which Jacques declined, saying he would go out by the gangway. When he went to go off his great paleness excited remark, as well as the evident stuffing out of his person. Two other seamen meeting him observed this, and thought he might be stealing clothes or smuggling cigars. They had some conversation with him concerning the probability of his being observed as he went off the gangway. Satisfied that he was not stealing clothes, they did not report him. No attention was given him as he passed out of the gangway, nor does it appear conclusively that there was any person there at that time upon the watch for suspicious characters. The quartermaster assigned to that duty was not examined. The loss was not discovered until the vessel arrived at Havana, and, on opening the locker, the box was found broken open and all the coin gone except a small bag in one corner.

I cannot hold, upon the evidence, that the place where the locker was put was, in itself, an improper one, so as to constitute negligence. The evidence shows that the place of this locker, in the run of the ship, under the glory-hole, was frequently used for such purposes; and that in some of the last and best steamers built that place was selected as the safest. In those the scuttle was secured by two iron bars across the top, fastened by padlocks, without any lock in the edge of the scuttle. In other cases, safes or lockers in the cabin are used, with upright doors.

There are several particulars, however, wherein I feel bound to

hold that the ship did not exercise the customary and reasonable vigilance required in the care of such treasure:

(1) The failure to lock the iron bar across the top of the scuttle. This bar was a part of the equipment of the ship, and one of the provisions for the security of the locker. The failure to use it was neglect of one of the customary and ordinary means of security. It cannot be called immaterial or unnecessary. Even if not used when there was no coin in the locker, had it been used as soon as the coin was put there, it would probably have prevented the theft, as there is no evidence that Jacques was provided with ready means to unlock the padlock, and every obstruction is of the greatest importance where the theft, to be successful, must be accomplished in a very brief space of time.

(2) The lack of reasonable vigilance to prevent tampering with the fastenings of the locker before the coin was placed there. No safe can be of any value if proper care is not exercised to prevent its locks or keys being tampered with. This care is equally necessary whether the safe at the moment contains valuables or not. The evidence shows that no special care was taken of the key of the main lock, until after the coin had been received. I am inclined to think, however, that the key was immaterial in this case, because the inference from the evidence is that the scuttle, before the coin was received, was left unlocked. But it was want of reasonable care to leave the lock unfastened, when it was so slightly secured in the edge of the scuttle that the whole lock was easily removable.

(3) Neglect of any precautions to prevent access to the glory-hole after this treasure was received. If it be said that the waiters, whose berths were in the glory-hole, might be expected to supply the needful precaution against thieves, the evidence shows that no reliance was to be placed on them, and that they were plainly remiss in the duty which they owed to the ship in not reporting at once their clear observation and knowledge that Jacques was engaged in some illicit or criminal design. Some guard or check ought to have been provided against repeated access to the glory-hole and locker by persons having no business there.

(4) I cannot resist the conclusion that there was negligence also in the proper observation of Jacques upon his repeated visits to the ship after his discharge, and also at the time when he left the ship with his booty visibly and plainly stuffed about him. These repeated visits excited the suspicions of two of the seamen, who observed him as above stated. They knew the danger of theft of their clothing on sailing days, and they gave Jacques sufficient watch and examination to satisfy themselves that he was not stealing their clothes. They did suspect he was carrying off smuggled articles; and, in my judgment, they knew that he was engaged in some criminal project. The plan of the theft required Jacques to come upon the ship three times in the prosecution of his design during the few days the ship

was lying in port. He had no business there. His repeated visits were of themselves suspicious, as the two seamen well understood, and these visits should have been known and observed by some responsible officer of the ship. The habit of admitting friends of the passengers on sailing days on board the ship undoubtedly gives opportunity for thieves to come aboard, but this renders it obligatory to keep reasonable watch of the movements of suspicious characters. Had reasonable attention and watch been given at the gangway, it is difficult to see how Jacques, stuffed out, pale, and staggering with 125 pounds of gold in bags about his waist, could have passed unobserved.

While the facts in this instance present none of those evidences of gross negligence which were exhibited in the case of *King* v. *Shepherd,* 3 Story, 349, 361, I cannot avoid the conclusion that there was a lack, in the particulars above mentioned, of that reasonable vigilance and caution to prevent theft which the law imposes upon the carrier, notwithstanding the exception of loss by theft or robbery; and a lack of that care also which, by the common understanding, the ship is expected to exercise. This negligence, both before and at the time of the theft, co-operated with it. Without this neglect, I am satisfied the theft would not have been accomplished; and the libelant is therefore entitled to a decree for $22,871.50, with interest from June 1, 1880, and costs.