CUNARD S. S. CO., Limited, v. KELLEY et al.

(Circuit Court of Appeals, First Circuit. April 18, 1902.)

No. 419.

1. SHIPPING—BILLS OF LADING—RATIFICATION OF UNAUTHORIZED ISSUANCE.
    A steamship company, whose agent has without authority issued bills of lading for goods then in a public warehouse, does not ratify such act and make the bills its own by receiving on board one of its vessels goods purporting to be those described in the bills, where by reason of a fraudulent substitution in the warehouse, of which it was ignorant, the goods actually delivered to it are not the same.

2. SAME.
    The unauthorized issuance by an agent of a steamship company of bills of lading to a purchaser for goods then in a public warehouse, subject to the orders of the seller, who is bound by the terms of the sale to deliver the same on board, does not bind the company, so as to make it responsible for the goods while in the warehouse and before their actual delivery into its custody; and even an acceptance of the goods on board ship is a ratification of the contract of carriage made by the bills of lading only from the time of such delivery.

3. SAME—AUTHENTICATION OF BILLS OF LADING.
    Bills of lading do not prove themselves, and the burden rests upon a shipper relying thereon to prove their execution by a duly authorized agent of the carrier.

**4.** SAME—BILL OF LADING AS RECEIPT—CONCLUSIVENESS.

A bill of lading is both a receipt and a contract of carriage, and as a receipt it is open to explanation.[1]

**5.** SAME—CARRIAGE OF GOODS—ACTION FOR NONDELIVERY.

In an action by a shipper against a steamship company for non-delivery of goods, the burden rests upon the plaintiff to prove delivery of the goods to defendant for carriage; and bills of lading, signed for the master, and acknowledging the receipt of goods on the ship, even though shown to have been executed by a duly authorized agent of defendant, are insufficient for that purpose, where plaintiff's evidence further shows that when they were executed the goods had not been received on board ship, nor consigned to the care of a master, but were in a public warehouse, registered in the name of a third party, and that there was no vessel in port.

**6.** SAME.

Goods were purchased by an agent, to be exported to the purchaser; the sellers contracting to deliver the same on board ship at their expense, which was required to be done by means of lighters. The sellers deposited the goods in the name of their own agent in a public warehouse, from which they could be removed only on the order of the agent. While so stored bills of lading for the goods were executed by an agent of a steamship company to the purchaser's agent; no vessel of the company being then in port. On arrival of the ship on behalf of which the bills were executed, goods purporting to be those sold and covered by the bills of lading were delivered on board by the sellers, and accepted. In a subsequent action by the purchaser against the steamship company for nondelivery of the goods, the authority of defendant's agent to issue the bills of lading, under the circumstances shown, was in dispute. Defendant also introduced evidence tending to show that a fraudulent substitution had been made in the warehouse, and that the goods received on board were not in fact those covered by the bills of lading. Held, that it was error to instruct the jury as a matter of law that the execution of the bills of lading, taken in connection with the subsequent acceptance of the goods on board thereunder, operated to place them in the constructive possession of defendant from the date of the bills, making it responsible for their care and protection thereafter, but that the questions of the agent's authority to issue the bills, and whether there was an actual delivery of the goods to defendant, were under the evidence both questions for the jury, upon which plaintiff had the burden of proof.

**7.** SAME—ACCOMMODATION BILL OF LADING—EFFECT AS RECEIPT.

The giving of a bill of lading as a matter of accommodation, before the actual delivery of the goods, does not impose upon the carrier an obligation to make an effort to get possession of the goods wherever they may be, when the owner has contracted to deliver them on board the carrier's vessel; but as proof of the actual taking of possession by the carrier the bill stands as a mere receipt, subject to rebuttal or explanation, by showing that it was not the intention of the parties to make any change in the actual or legal custody of the goods until loaded.

**8.** SAME—EXEMPTIONS IN BILL OF LADING—CONSTRUCTION AND VALIDITY.

A general clause in a bill of lading, exempting a shipowner from liability for loss of goods while on the quay, or loss by thieves, is not to be construed as applying to cases where such loss arises through the carrier's negligence or failure in proper custody or care, so as to render it invalid, under section 1 of the Harter act (27 Stat. 445), providing that "any and all words and clauses of such import inserted in bills of lading or shipping receipts shall be null and void," nor is it rendered void, under such provision, by a subsequent clause extending all exemption provisions to cases of negligence, the two clauses being separable; but the carrier is entitled to the benefit of the exemption, unless it is found that its negligence or fault contributed to the loss.

---

[1] See Carriers, vol. 9, Cent. Dig. § 148.

9. EVIDENCE—COMPETENCY—SIMILAR FACTS IN CONNECTION WITH SAME TRANS-
ACTION.

In an action against a steamship company for nondelivery of goods,
it appeared that plaintiffs' agent purchased a quantity of goods from a
firm in a foreign port, the sellers contracting to deliver the same on
board ship at their expense; that the sellers stored the goods in a
public warehouse, where they remained subject to their order only,
until removed by them for delivery on board the vessel; that on de-
livery of the packages to plaintiffs they were found not to contain the
goods purchased and described in the bills of lading. Defendant offered
evidence to show that other packages, constituting a part of the same
purchase and stored in the warehouse at the same time, which had
been shipped by a vessel of another carrier, were found on delivery
to plaintiffs to have been similarly tampered with, and their contents
changed. *Held*, that such proof was strong and legitimate evidence to
support defendant's contention that the substitution had been made by
the sellers, who had the same motive and opportunity in both cases,
and that the pendency of a similar action against the other carrier, in-
volving the goods shipped by its line, constituted no ground for its ex-
clusion.

In Error to the Circuit Court of the United States for the District
of Massachusetts.

George Putnam (James L. Putnam, on the brief), for plaintiff in
error.

Sherman L. Whipple (Whipple, Sears & Ogden, on the brief), for
defendants in error.

Before COLT, Circuit Judge, and ALDRICH and BROWN, Dis-
trict Judges.

BROWN, District Judge. This writ of error is to review the rul-
ings of the circuit court, in an action at law for failure to deliver at
Boston 53 bales of goatskins alleged to have been delivered to the
Cunard Steamship Company, at Naples, Italy, for transportation to
Boston, Mass. The chief defense of the steamship company was that
the goods were not delivered to it for carriage.

The rulings of the circuit court relating to the question of delivery
present the principal questions before us.

It is agreed that:

"The Cunard Company had no dock at Naples, and goods shipped by its
steamships had to be put on board in lighters. The Punto Franco is a wharf
and warehouse owned by a limited company called the 'Societa Meridionale
dei Magazzine Generale,' a 'Societa Anonima' or limited company, in which
goods intended for shipment are deposited by the owners or shippers until
they should be put on board.

"It was a frequent practice of steamship agents in Naples to give bills of
lading to shippers of goods deposited in the Punto Franco to await the ar-
rival of steamships."

Garsin, the agent of the plaintiffs, brought from Petriccione Bros. in
Naples two lots of goatskins,—the first of 38 bales, and the second
of 15 bales. By agreement, the Petriccione were to make delivery
of the bales on board steamer, and the price paid was free on board.
Both lots of goods were entered at the Punto Franco in the name of
Ricciardi, the Petriccione's shipping agent. The Petriccione were
to bear the expense of lightering the goods from the Punto Franco
to the steamer. Goods entered in the Punto Franco are registered

in the name of the depositor or his shipping agent, are given a number on the books, and can be taken from the Punto Franco only by the direction of the person in whose name they stand. While the goods were thus on deposit in the Punto Franco, and standing in Ricciardi's name, two bills of lading were issued to Garsin. The bill for the lot of 38 bales contained the following statement:

"Shipped in good order and condition by A. Garsin & Co., in and upon the good steamship called the Aleppo, whereof —— is master for the present voyage, * * * and now lying in this port and bound for the port of Liverpool, for Boston, Mass."

This bill of lading was signed, "For the master, p. Nicola Ferolla, Ettore Rondino." The bill for 15 bales acknowledged receipt of the goods upon the Tarifa, and bore a like signature.

It was agreed that Ferolla was the agent of the Cunard Company, "with authority to sign for the master bills of lading for the transportation of merchandise delivered on board the steamships of that company at Naples," and "Rondino was Ferolla's clerk, with power to exercise his authority."

At the time of signing and delivery of the bills of lading, no vessel was in port.

The stipulated facts did not show that Rondino was authorized to receive goods on behalf of the company at the Punto Franco, or to give bills of lading for goods deposited there.

The circuit court instructed the jury that the bills of lading were the bills of lading of the Cunard Company, irrespective of any direct evidence in the case as to the authority of Rondino, saying:

"The Cunard Company received the freight called for by them, and assumed to deliver the goods they described, and therefore it accepted the papers as its bills of lading."

In these instructions we find substantial error.

The Cunard Company contended that, after the delivery of the bills of lading to Garsin by Rondino, and while the goods were in the Punto Franco, and before they had come into the possession of any authorized agent of the company, a fraudulent substitution of goods was made; that bales of sheepskins were substituted for the goatskins described in the bills of lading; and that, though the Cunard Company did receive aboard the steamship Tarifa 53 bales, which, by their marks, purported to be the goods described in the bills of lading, they were not in fact the same goods.

There certainly was evidence to support this contention, and to entitle the Cunard Company to a finding by the jury thereon.

If, in receiving goods aboard the Tarifa, the company's agent was deceived or misled by fraudulent marks, and took aboard, carried, and delivered other goods than those described by the bills of lading, such acts cannot amount to an acceptance or ratification of bills of lading previously unauthorized.

If the act which is relied upon to establish a ratification was itself induced by deceit or mistake, it cannot amount to ratification.

Unless the fact of substitution of goods was known to the company, it did not ratify. Bennecke v. Insurance Co., 105 U. S. 359, 360, 26 L. Ed. 990; Cook v. Tullis, 18 Wall. 332, 21 L. Ed. 933.

The case was sent to the jury upon the theory that the question of actual authority was immaterial. Let us consider the case upon this view.

Unless authorized, Rondino's acts were not an acceptance of the goods at the Punto Franco. While in the Punto Franco, and in the possession of the Punto Franco for the owners, or for Ricciardi, or perhaps for Rondino, the goods were at the risk of one or more of these persons. The Cunard Company, on this view, was under no obligation to care for the goods; and for all that occurred during the period when the goods were at the Punto Franco the Cunard Company was without liability, either for negligence or for breach of contract.

During this time a substitution of goods was made. This was a fraud practiced upon the persons then in possession. If the Cunard Company subsequently received the substituted goods as and for the goods originally deposited, in ignorance of the fact that through the misfortune or fault of the shipper or his agent they had been changed, are we to say that this innocent mistake makes it responsible, on the ground that it voluntarily assumed responsibility for a loss which occurred entirely through the fault of others? Its acceptance of goods aboard ship was at best a ratification of the written contract of carriage, but cannot be held to amount to a ratification of a previous receipt of goods. The contract of carriage, if ratified, is still conditional upon the actual delivery of the goods.

In The Idaho, 93 U. S. 582, 23 L. Ed. 978, it was said:

"A delivery of goods to a ship corresponding in substance with a bill of lading given previously, if intended and received to meet the bill of lading, makes the bill operative from the time of such delivery."

The receipt of goods not corresponding in substance to the bill of lading could not make the bill of lading good from the date it was delivered.

There would be absolutely no consideration to support a promise by the Cunard Company to pay for goods which it did not in fact receive, and which were lost at a time when the company was not responsible for their custody.

The burden was on the plaintiffs to prove delivery of the goods to the Cunard Company.

We are of the opinion that neither party is entitled to require that this court, upon the evidence before it, should decide whether the goatskins in question were actually received upon the Tarifa. This was a question of fact for the jury. This question was taken from the jury and therefore the defendants in error must support the verdict by showing that the goods were delivered to, and accepted by, the Cunard Company at the Punto Franco.

The circumstantial evidence as to Rondino's actual authority to receive goods at the Punto Franco, and to give bills of lading for goods there deposited, was, at least, insufficient to justify a direction that the bills were the bills of the Cunard Company.

The bills of lading did not prove themselves, and the burden rested upon the plaintiffs to prove execution by a duly authorized agent.

We are of the opinion that there was evidence from the plaintiffs

which entitled them to go to the jury upon the questions of Rondino's authority, and the due execution of the bills of lading, and that the question of authority was one for the jury.

But, even if the bills of lading were issued by a duly authorized agent of the Cunard Company, this would still be insufficient to justify the direction of a verdict for the plaintiffs. A bill of lading is both a receipt and a contract of carriage. As a receipt, it is open to explanation.

The plaintiffs had the burden of proving the allegation that they had delivered these goods to the defendant for carriage. They offered certain bills of lading, which, if duly executed, were evidence of what appeared on the face of the bills, to wit, an acknowledgment of the receipt of goods on board the ship by the master. The prima facie case created by these bills was overthrown by evidence offered by the plaintiffs themselves, to the effect that the bills of lading were executed and delivered before the goods were received aboard ship, or consigned to the care of a master, and while no vessel was in port. The burden of proof still remained upon the plaintiffs to show a delivery to the company. Upon the whole case, the burden was not upon the defendant to show that it had not authorized the receipt of goods in the Punto Franco, but upon the plaintiffs to prove that it had.

The court further instructed the jury, as follows:

"While the goods were in the Punto Franco, after the bills of lading were given, they were, by the effect of the bills of lading, held by that public warehouse for the defendant corporation and as its representative, except so far as, in accordance with the understanding between the parties, the persons from whom the goods were purchased were to take a part in transporting them from the wharf to the vessel. If there was neglect with reference to them on the part of the Punto Franco, it is to be presumed that the defendant has its remedy over against that association."

The court further instructed the jury that, the defendant having given bills of lading for the goods while in this public warehouse, it was its duty to make efforts to have the goods transferred on the books of the Punto Franco to itself, or otherwise to see to it that there was no intermeddling with the goods during their custody by the Punto Franco. In these instructions we think the circuit court was in error.

While a public warehouse may become the agent of various persons, and may become the agent for whom it may concern, there is no conclusive evidence that relations were established between this warehouse and the Cunard Company. The possession of Ricciardi seems to us inconsistent with possession by the Cunard Company.

To effect a complete delivery to a carrier, goods must be put into the carrier's absolute control. Before these goods were ready for shipment, it was necessary that they should be withdrawn by Ricciardi, the person known to the Punto Franco, carried to the vessel on lighters, and put on board. Ricciardi testified that the bales could not be touched or examined without his authorization. The Petriccione were to pay charges for the entry and the exit of the goods in the Punto Franco. Garsin testified that to withdraw the goods required the authorization of the custom house, of the Punto Franco, and of Ricciardi. Therefore, before the Cunard Company could have had a

complete control and custody of the goods, it must have procured the assent of Ricciardi, the agent of the vendors, of the custom house, of the Punto Franco, and could not have loaded the goods save by paying or making satisfaction for all fees and also paying the charges of lightering. As it assumed no obligation to do these things, its contract was conditional upon their being done by others.

The giving of a bill of lading does not of itself amount to an actual taking of possession of the goods described, nor by itself effect a constructive change of possession; nor, if it be given as a matter of accommodation before the actual delivery of the goods, does the giving of a bill of lading impose upon the carrier an obligation to make an effort to get possession of the goods, wherever they may be, when the owner has contracted to deliver them to the carrier. As proof of the actual taking of possession, the bill stands as a mere receipt, subject to rebuttal or explanation; and the plaintiffs' evidence in this case furnished the explanation of the actual occurrence.

We do not think that the case of Railroad Co. v. McFadden, 154 U. S. 155, 14 Sup. Ct. 990, 38 L. Ed. 944, supports the instruction that the giving of a bill of lading for goods in a public warehouse works a constructive change of possession. While in that case there was a reservation of opinion as to what would be the rule of law if the goods had been constructively delivered to the carrier through the compress company, the question of what amounts to constructive delivery of goods in the possession of a third person was not involved. It is clear that, had these goods been in the shop of the Petriccione at the time of the giving of the bills of lading, there would have been no change of possession; and we are not prepared to say that the situation is altered by the fact that they were delivered by the vendor to a warehouse, wherein it is agreed, "Goods are deposited by the owners or shippers until they should be put aboard."

As the case was left upon the evidence, the actual possession and custody was in a third person; that is, the Punto Franco Company. Upon the question of agency of the Punto Franco, the evidence shows that there was custody for and in behalf of the Petriccione's agent, Ricciardi; and assuming that the title to the goods had passed to Garsin, Ricciardi, as agent of the Petriccione, must be regarded as the agent of the owners and shippers of the goods. As no steps were taken to have the record in the Punto Franco changed, and as the record of title was entirely consistent with an intention that the Punto Franco should continue to hold the goods on behalf of the shipper until the goods were actually shipped, it was error to rule, in effect, that such evidence as was afforded by bills of lading showed conclusively, and as a matter of law, a constructive change of possession. In one view of the evidence, the transaction amounted to this: The goods were in the hands of the Punto Franco to hold for Ricciardi, who was in no wise the agent of the Cunard Company. Ricciardi undertook, not only to withdraw them and put them aboard at the cost of the Petriccione, but also to store them at his own charge until he should do this. Under these circumstances, and in the reasonable expectation that the goods would come aboard the ship, and at the request of the shipper, who was cognizant of all the circum-

stances, Rondino gave a bill of lading, stating that the goods had been actually shipped. Upon the view most favorable to the plaintiffs, they might be entitled to go to the jury for a determination of the question of fact as to whether or not it was the intention of the parties to cast upon the Cunard Company responsibility for the care of the goods while in the Punto Franco. They were not entitled to an instruction that a bill of lading, given while goods are in a public warehouse, by itself works a constructive delivery of goods, or that, upon the evidence in this case, there had been a delivery to the Cunard Company.

While we incline to the view that the evidence was insufficient to prove a delivery to the Cunard Company at the Punto Franco, yet, as the plaintiffs contend that the goods actually went aboard the Tarifa marked in accordance with the bills of lading, a decision that there was no delivery at the Punto Franco would not be a final decision as to the rights of the parties. It is, therefore, sufficient for us to say that the evidence warranted, if it did not require, the inference that the bills of lading were issued merely for the convenience of all parties, and with no intention of making any change in the actual or the legal custody of the goods until loaded. St. Louis, I. M. & S. R. Co. v. Commercial Union Ins. Co., 139 U. S. 227, 238, 11 Sup. Ct. 554, 35 L. Ed. 154. The direction of a verdict was, therefore, erroneous.

The defendant also contended at the trial below that, even if the goods were received at the Punto Franco, it was not liable, by reason of exemptions in the bills of lading, against loss by thieves and loss while goods were on the quay.

The circuit court held, as to these exemptions, that it felt bound to follow the rule laid down in Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, and that it was prohibited from giving effect to so broad an exemption as the provisions called to its attention.

While that case is an authority to the effect that a common carrier cannot, by exception in a bill of lading, exempt himself from liability for loss to which the negligence of himself or his servants has contributed, the case does not seem to us decisive of the validity of the exemptions here involved.

That the common-law liability of a carrier may be limited by special contract, as to losses not due to negligence or fault, is well established. New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. 344, 12 L. Ed. 465; York Mfg. Co. v. Illinois Cent. R. Co., 3 Wall. 107, 18 L. Ed. 170; The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519; The Queen of the Pacific, 180 U. S. 49, 56, 57, 21 Sup. Ct. 278, 45 L. Ed. 419.

With reference to the exemptions of loss of goods while at the quay, and as to loss by thieves, the defendants in error contend that the exemptions are invalid, so far as they are exemptions against negligence, and that, as the defendant failed to offer any evidence to account for their loss, it will be presumed to have arisen from negligence.

There was, however, sufficient evidence to have warranted the jury in finding as a fact that the substitution of goods was made by the Petriccione at the Punto Franco; and, under all the circumstances, it could not have been ruled, as a matter of law, that the Punto Franco,

or the steamship company, was negligent in not guarding against a fraudulent scheme of this unusual character, committed by a person whose duty to put the goods aboard ship may have facilitated the commission of a fraudulent scheme by substitution of marks and labels. Such access to the goods as rendered the fraud possible seems to have been due to the fact that the Petriccione were the shippers' agents.

Nor does it seem to us that these exemptions are invalid, as a matter of law. Chapter 105 of Act Feb. 13, 1893 (27 Stat. 445), provides that it shall not be lawful to insert in a bill of lading provisions relieving from liability for loss arising from negligence or failure in proper custody or care, and that "any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

While there is, in these bills of lading, a general provision that goods on the quay shall be at the sole risk of the shipper, this provision is not accompanied by any clause in terms exempting from negligence; and the proper construction of such general language restricts it to cases where the carrier is not at fault for negligence or failure of due care.

In Compania de Navigacion La Flecha v. Brauer, 168 U. S. 104, 123, 18 Sup. Ct. 12, 17, 42 L. Ed. 398, it was said:

"The words 'on deck at owner's risk' cannot have been intended by the parties to cover risks from all causes whatsoever, including negligent or willful acts of the master and crew. To give so broad an interpretation to words of exception, inserted by the carrier and for his benefit, would be contrary to settled rules of construction, and would render nugatory many of the subsequent stipulations of the bill of lading."

See, also, Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; Constable v. Steamship Co., 154 U. S. 51, 14 Sup. Ct. 1062, 38 L. Ed. 903.

Properly construed, therefore, the exemption is not invalid.

So, also, a general exemption against thieves is valid, and is not to be construed as including or applicable to a case where there was negligence on the part of the ship which contributed to the theft, or facilitated it. The Saratoga (D. C.) 20 Fed. 869.

While this bill of lading, in connection with the exemption of "thieves," contains the clause:

"Whether any of the perils, causes, or things above mentioned, or the loss or injury arising therefrom, be occasioned by the wrongful act, default, negligence, or error of judgment of the owners, pilot, master, officers, crews, stevedores, or other persons whomsoever in the service of the ship, etc., or otherwise,"—we think that the existence of this clause does not require us to hold the exemption entirely invalid, since by the terms of the statute, only "words or clauses of such import" are made null and void.

As the clauses exempting from negligence are separable, they do not entirely invalidate the exemption. The Saratoga (D. C.) 20 Fed. 869, 870.

We are therefore of the opinion that there was error in the ruling that the exemptions were to be given no effect; but we are

also of the opinion that the defendant was not entitled to a direction that, by these exemptions alone, it was freed from liability.

The jury, in our opinion, should have been instructed that the defendant was entitled to the benefit of these exemptions, unless upon the facts in evidence the jury should find that the negligence of the company or its agents contributed to or facilitated the substitution of goods, if it should be found that a substitution was made at the Punto Franco.

The third assignment of error relates to the exclusion of evidence. The defendant offered evidence tending to show that the Petriccione had perpetrated a similar fraud upon Garsin in relation to a previous shipment of 37 bales of goatskins by the steamship Scindia of another line. The plaintiff Kelley testified, against objection of plaintiffs' counsel, that 37 bales, shipped to the plaintiffs by the Petriccione upon the Scindia, were also found, upon delivery to the consignee, to consist of sheepskins and refuse goatskins, instead of the goods called for by the bill of lading.

The defendant contended that evidence of this previous fraud was admissible, since both lots of skins were parts of the same purchase made by Garsin from the Petriccione, and that the shipment upon the Scindia and the shipment on the Tarifa were parts of a continuous scheme of fraud, and parts of one transaction. It was argued that Garsin had already been tricked once, and that this supported the inference that he was tricked out of the goods now in question in a similar way; in other words, that the fact that the Petriccione had cheated Garsin out of one part of his purchase pointed to the Petriccione as the persons who had cheated him out of the goods in question in this case.

We think that proof that the Petriccione had made the substitution of sheepskins in the Scindia shipment would lead to a strong and legitimate inference, under the circumstances of this case, that it was they who did the same thing with the Tarifa shipment. The shipments were by steamers of different lines. Both lots of goods were deposited in the Punto Franco in the name of the Petriccione's agent. Both shipments being under the same control at the Punto Franco, both having been treated in the same way by an unusual trick, the alternative is either that on two steamers the same unusual trick originated from different persons, or that both tricks were perpetrated by the same person. The similarity of the occurrences pointed to one person as the author, and to a person who had access to both lots of goods while in the Punto Franco.

Were the question between the Petriccione on the one side and their vendee on the other, and were it proved that, upon delivery at Boston, the Scindia bales and the Tarifa bales both contained sheepskins, instead of goatskins, we have no doubt that direct proof that the Petriccione had tampered with a portion of the goods, even a single bale, and had access to all, would be competent and sufficient evidence to prove them to be the author of the entire substitution, and to support an allegation that they had not shipped the goods which they agreed to ship.

While the defendant is directly concerned with only a part of the entire purchase, we fail to see why it is not entitled to the same scope of evidence as would be open to the plaintiffs, were they sued by the Petriccione, for the price of the goods, and made defense on the ground that the goods had not been shipped.

In Steph. Dig. Ev. art. 3, it is said:

"Whether any particular fact is or is not part of the same transaction as the facts in issue is a question of law upon which no principle has been stated by authority, and on which single judges have given different decisions."

We are of the opinion, however, in the present case, that the fact that goods bought for the plaintiffs from the Petriccione were sent in two shipments by different lines of steamers does not alter the fact that there was, as between the plaintiffs and the Petriccione, what may be regarded as a single transaction, to wit, the sale and agreement to ship the amount of goods covered by the bills of lading for both shipments. All the goods in both shipments had been tampered with in the same way. It was improbable that this was done on two different steamers by different persons. The true boundaries of the main transaction, so to speak, were, on the one side, the sale and agreement to deliver aboard ship all the goods purchased, and, on the other side, the failure to receive any of the goods purchased and the receipt of substituted goods. The intermediate and subordinate transactions were the separate shipments on separate steamers. These shipments were traceable to a common source, the Petriccione, who had the opportunity to make the change at the Punto Franco. Proof, therefore, that a part of the substitution had been effected there by them would be, in our opinion, strong and legitimate evidence to support the contention that the remainder of the substitution had also been accomplished by the same persons and at the same place.

We are of the opinion that the evidence was competent. It is nevertheless necessary to consider the precise ground upon which it was excluded.

The objection was as follows:

"On the ground that the events connected with the Scindia are a subject-matter of another suit, which is to be tried in this court, the counsel for the defendant in which case are now present, very properly, of course, to hear such disclosures as may be made in this case concerning the Scindia lot. We are not trying the Scindia case here now, and it is not material in this case, and I prefer not to go into it, because, if we do, we must go into it at length."

We think these reasons insufficient for the exclusion of the evidence. If, in the trial of each suit, the evidence should be strictly confined to the goods directly involved, the result would be to split up the actual main transaction between the Petriccione and the plaintiffs into two distinct and artificial parts. Each subordinate part of this main transaction would then stand alone, and would receive no light from the other. Neither case would then comprehend the whole business transaction, nor the important facts that both lots of goods had been tampered with in the same way, that one person had the motive and opportunity in both cases, that the trick in each case indicated a com-

mon author, the Petriccione, and negatived two authors, the two steamship lines. We think that the exclusion of the evidence for the reason assigned by counsel was error.

We are of the opinion that the judgment should be reversed, and the verdict set aside, for the reasons set forth in the third, fifth, sixth, seventh, eighth, ninth, and tenth assignments of error.

The eleventh request for instructions, referred to in the fourth assignment of error, in our opinion, should have been granted, but with additional instructions that the exemption was inapplicable if the defendant had received the goods and was guilty of negligence in relation to their custody.

The remaining assignments of error are either insufficient or too broad to raise the questions argued in connection therewith upon the brief, or called for instructions as to the effect of evidence to which the defendant was not entitled.

The judgment of the circuit court is reversed, the verdict set aside, and the case remanded to the circuit court for further proceedings not inconsistent with this opinion, and the costs of appeal are awarded to the plaintiff in error.