THE JULIA, LUCKENBACH.

(Circuit Court of Appeals, Second Circuit. June 6, 1916.)

No. 277.

1. SHIPPING ☞121(2)—LIABILITY FOR LOSS OF CARGO—UNSEAWORTHINESS OF VESSEL.

The sugar cargo of an iron steamer under charter to the carrier was damaged by sea water, which entered through a hole in the half-inch iron sheathing near the keel, where it had become rusted through from the inside by the action of sugar and salt water, which had reached the plates because the cement lining had either been broken or become loose. The vessel had been carrying sugar cargoes for several years, and the corrosion must have been going on for months or years. The hull at that place had not been thoroughly inspected for more than a year. *Held*, that the loss was due to the unseaworthiness of the vessel, that due diligence had not been exercised by the owner to make her seaworthy, and that neither the vessel, owner, nor charterer was protected from liability by Harter Act Feb. 13, 1893, c. 105, §§ 2, 3, 27 Stat. 445 (Comp. St. 1913, §§ 8030, 8031), although the charterer's bill of lading contained an exception of unseaworthiness.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 450, 451; Dec. Dig. ☞121(2).]

2. CARRIERS ☞125—LIABILITY FOR LOSS OF CARGO—EXCEPTIONS IN BILL OF LADING—PROVISION FOR BENEFIT OF INSURANCE.

A bill of lading, providing that in case of loss or damage for which the carrier is liable it shall have the benefit of any insurance effected by the shipper, is not effective to protect the carrier from such liability to the extent of the insurance, where the contract of insurance limits the liability of the insurer for loss or damage to goods in possession of a carrier to so much as cannot be recovered from the carrier, although it requires the insurer to "advance" or "lend" to the insured the full amount of the loss until such recovery can be had, and in effect provides that action against the carrier shall be maintained for the benefit of the insurer and at its expense.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 552–556; Dec. Dig. ☞125.]

3. SHIPPING ☞141(4)—LIMITATION OF LIABILITY—EFFECT OF CHARTER.

The owner of a vessel who by a time charter has contracted to deliver her in a seaworthy condition and to maintain her in a thoroughly efficient state in hull and machinery during the charter term, cannot limit his liability for a loss occurring during such term due to her unseaworthiness.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 493; Dec. Dig. ☞141(4).]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the W. J. McCahan Sugar Refining Company against the steamship Julia Luckenbach, with the Insular Line, Edgar F. Luckenbach and others, owners of the Julia Luckenbach impleaded. Decree for libelant in the sum of $100,774.87 against all respondents, with limitation of liability to claimants of the Luckenbach, and the Insular Line appeals. Modified.

See, also, 200 Fed. 976.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The following are the opinions of Hough, District Judge, in the court below:

### On Final Hearing in Admiralty—Libel for Loss of Cargo.

The owners of sugar laden on the Julia Luckenbach brought action in rem against the vessel, and in personam against charterers, for the loss in question. Charterers appeared, the Luckenbach was claimed, and stipulation given in $60,000, which for the purpose of this case is her agreed value. Subsequently libelant's damages were raised by amendment to $87,000, whereupon the charterers petitioned in the Luckenbach's owners, in order that they might respond for so much of the recoverable loss as exceeds the agreed value of the steamer. The issues presented are therefore (1) whether the libelant can recover at all; and (2) whether the ship and owners, or charterers, or both, are responsible for recoverable damages.

For some years prior to April, 1912, the Julia Luckenbach, an iron steamer then about 30 years old, had carried sugar (during the season) between Porto Rico and Atlantic ports. In the month named she was under charter to the Insular Line, and on and before April 25th had loaded a partial cargo of sugar in San Juan harbor. At 2 a. m. of April 26th she left her pier, and at 7 a. m. arrived at Arecibo, where she completed cargo by taking on additional sugar. At 8:30 p. m. of April 27th she left Arecibo (where she had lain offshore loading from lighters) and proceeded on her voyage to Philadelphia. She encountered strong winds and rough seas, so that the vessel rolled and pitched a good deal, and shipped water in and over decks. She encountered that degree of strain to be expected in frequent Atlantic weather, and no more. It is not asserted that any injury received is due to peril of the sea, in the legal sense of that phrase.

At 7:40 p. m. on April 28th—i. e., after about 24 hours of rough weather—she was found to have 7 feet of water in her after hold, and was thereafter with great difficulty kept afloat (the after hold being of unusual size), until refuge was found in San Juan harbor. A hole was then discovered in a plate on her starboard side (strake B), very nearly, if not accurately, $1\frac{3}{4}$ by $\frac{7}{8}$ of an inch. At the edges of the hole the original $\frac{1}{2}$ inch of iron had worn to a knife edge; the plate in the immediate neighborhood was much decayed.

Temporary repairs were made, which naturally removed all cement from the vicinity of the hole. It is clear from the testimony of the vessel's officers that when examined in San Juan the cement backing was gone; but there is naturally no direct evidence as to the condition of said cement at and just prior to the breaking away of the iron plate.

There is satisfactory testimony that the outside paint showed no signs of scratching or abrasion in the vicinity of the hole, and that the hole itself was from 15 to 18 inches above the keel. This disposes of one issue raised in the pleading; i. e., that the Luckenbach lay aground at San Juan and was punctured or weakened by so doing. I think it is quite plain that the Luckenbach was in the mud in San Juan harbor; how much mud it is impossible to say with certainty, but it was soft. Vessels go in it a foot or more without requiring tugs to get them out. The Luckenbach was certainly not in that much, and even more certainly was never in deep enough to put the spot where the hole was found upon the ground—if soft mud is ground.

The immediate cause of flooding the hold and of the consequent destruction of sugar was the sudden breaking of the impaired plate. Such impairment of plate had evidently existed long before the beginning of the voyage, whether said voyage is held to begin at San Juan or the last port of departure from the United States. No vessel with such a thin plate is seaworthy; consequently the Luckenbach was not seaworthy, and she and her owners are responsible for the loss due to such breach of warranty, unless they exercised due diligence. This is the measure of their obligation, both under the bill of lading and the Harter Act.

Messrs. Martin and Work (both witnesses for the Luckenbach) have put in the record a satisfactory diagram showing the position of this hole. It was in a peculiarly difficult place to observe. Admittedly the plate or its cement could not be studied thoroughly without taking up the permanent ceiling,

though the region could be seen by removing boards loose for that purpose, and inserting a light behind the permanent ceiling boards.

The Luckenbach is old, but well constructed, and no criticism is made of the quality of her materials. The reason for the decay of this good iron plate is admitted; i. e., corrosion through a mixture of salt water and sugar—a subject sufficiently dwelt upon in The Alvena, 79 Fed. Rep. 973, 25 C. C. A. 261.

One witness deposes to knowledge of a substantial iron plate having been eaten away by this compound in less than 12 months. Mr. Martin would not like to say that it could be done in so short a time as 2 years, but he is quite certain that it could happen inside of 4 years. Thus neither to lawyers nor mariners is there anything novel in the danger to iron ships in the sugar trade, and the Luckenbach had long been engaged therein.

Due diligence must always be proportioned to the amount of danger reasonably anticipated, so it is evident that owners of this ship were bound to exercise special care to guard against the special danger that has produced this great loss.

The corrosive mixture of water and sugar must be in contact with metal in order to work damage; the cement backing is to prevent such contact. Evidently the Luckenbach's cement had either long been broken, or had not been tight against the plate—in the latter case forming a sort of pocket, where fluid would rest with peculiarly destructive results.

If the cement was broken, probably a thorough search with lights would have revealed it; but if it was loose nothing but taking up the ceiling and tapping the cement would reveal the hollow space. That the whole ceiling had not been up for three years is, I think, fairly shown; that it had not been possible to examine otherwise than by lowered lights for over one year is, if not plainly proven, admitted. This in my opinion was not due diligence, and I say this recognizing that the Luckenbach's defect was even more difficult to discover than that so thoroughly discussed by Brown, D. J., in The Alvena (D. C.) 74 Fed. 254, 255.

The above findings would dispose of the case, were it not for the claimants' and respondent's contention that for much, if not all, of the damage they are entitled to the benefit of shipper's insurance.

The lost sugar was shipped under bills of lading containing the familiar clause: "In case of any loss, detriment, or damage done to or sustained by said goods, or any part thereof, for which the carrier shall be liable to the shipper, owner, or consignee, the carrier shall to the extent of such liability have the full benefit of any insurance that may have been effected upon or on account of said goods."

Insurance was effected on said goods, with five separate companies, whose countervailing weapons in the long fight between shipper and carrier (or, rather, their underwriters) were not identical.

Some policies contained the words: "Warranted by the assured free from any liability for merchandise in the possession of any carrier or other bailee who may be liable for any loss or damage thereto, and for merchandise shipped under a bill of lading containing a stipulation that the carrier may have the benefit of any insurance thereon." [1]

Others provided: "In case any agreement be made or accepted by the assured with any carrier or bailee by which it is stipulated that such or any carrier or bailee shall have, in case of any loss for which any carrier or bailee (or their underwriters) may be liable, the benefit of any insurance effected by the assured, then and in that event this policy shall be void as regards any liability for such loss hereunder." [2]

Down to this point the two forms are alike in effect. All the policies antedated the shipment, and were (pro tanto) voided by the issuance and acceptance of the bill of lading. The policies last referred to continue as follows: "But this company, in these and all cases of loss or damage by peril insured against, shall be liable and owe actual payment for (only) what cannot (and could not in the absence of this insurance) be collected from carriers

---

[1] Federal Insurance Company, ½ risk; Thames & Mersey Company, ⅛ risk; Ætna Insurance Company, 3/32 risk.

[2] St. Paul Fire & Marine Company, 3/16 risk; Manheim Insurance Company, 3/32 risk.

and/or bailees of property lost or damaged, and shall also be chargeable with the direct pecuniary loss to the assured temporarily arising from delay in collecting from said carriers and/or bailees; and the advancing (for the purpose of avoiding only of such pecuniary loss) of funds to the assured for his protection pending such delay, shall in no case be considered as affecting the question of the final liability of this company, but as soon as collection is made from carriers and/or bailees, the assured shall retain only such proportion of the sum or sums so advanced by this company as will with the amount collected from carriers and/or bailees, make up the sum of the assured's loss, and the balance of the sum or sums as may have been advanced by this company shall thereupon be paid back to this company; but if no such collection can be made from carriers and/or bailees, the assured shall retain so much of said sum or sums so advanced by this company as shall not exceed the actual liability of this company thereby established (provided always the loss shall constitute in other respects a claim under this insurance)."

These clauses amount to a contract by insurers to advance sufficient funds to the insured to protect him from the pecuniary loss temporarily arising from delay in collecting from carriers, and to an agreement to pay the difference between actual loss and recovery from carriers, not exceeding the amount of the insurance nullified by the earlier words of the policy.

When libelants lost their sugar, this libel was filed by counsel for the underwriters, and a few days later receipts were signed by libelants evidencing large payments,[3] to them by their several insurers. The form of these receipts varies slightly. The variances are of no importance, and the material points may be shown by the receipt taken by the St. Paul Fire & Marine Company, which is one of the underwriters covenanting to advance money.

This receipt reads: "Borrowed and received of the [insurer] $18,583.30 as a loan, and not as a payment of any claim which we may have against said insurance company. This amount is loaned to us and is to be returned by us to the [insurer] when and to the same extent which we recover from any other person or corporation the value of [the lost sugar]. In consideration of said loan we hereby agree to use our best endeavors to recover the value of the sugar from all persons or corporations who may be liable therefor, and that we will institute and prosecute all suits in our name for that purpose, as we may be requested by the [insurers] but at their expense and not ours." It is signed by libelant.

As a compliance with the terms of its own policy, this receipt is a curiosity. But whether or not bound to do anything by their policies' terms, the receipts all show payments called loans, which the lenders are to get back as best they can by suing somebody at their own expense, but in the name of the insured. Sometimes the claim in suit, the bills of lading for the lost merchandise, are specifically pledged for "repayment" of this "loan";[4] but all the receipts would leave the uninitiated with the belief that the "loan" had no other origin than a desire to buy a lawsuit.

The foregoing lengthy statement can be justified only by a desire that this case be taken further, and some settlement reached in a matter wherein the fictions and subterfuges of the law would excite the admiration of a casual ejector. It is not necessary to go beyond this circuit for instances. The decisions in Pennsylvania Railroad v. Manheim Ins. Co. (D. C.) 56 Fed. 301, Pennsylvania Railroad v. Burr, 130 Fed. 847, 65 C. C. A. 331, and Bradley v. Lehigh Valley Railroad, 153 Fed. 350, 82 C. C. A. 426, give a very fair picture of the sort of thing which has rendered the decision in Phœnix Insurance Co. v. Erie & Western Tr. Co., 117 U. S. 312, 6 Sup. Ct. 750, 29 L. Ed. 873, only useful among fools.

What was done in this case, the course of business pursued, the anticipated, agreed upon, and paid-for insurance schemes, differs from that pursued, investigated, and approved in the Burr and Bradley Cases in no material particular. The sole difference in the record is that these carriers have produced

---

[3] How large cannot be fixed, as all the receipts have not been filed. Apparently more was "advanced" than is sued for.

[4] Federal Insurance Company; Ætna Insurance Company.

in court the man behind the apparatus of papers, and Mr. Ogden has naturally told the truth.

This record contains proof that, when a shipper gets insurance he (or his broker) knows that by the policy he pays for he is left (pro tanto) without insurance whenever he accepts a bill of lading requiring him to give the carrier the benefit of his contract; but he is contemporaneously assured that by a gentleman's agreement, paid for by his premiums, he will receive against usual proofs of loss the amount he would have gotten had there been no bill of lading, that he will never be called on to pay back any of the money, and that as far as he is concerned his insurance protection is as absolute as though one clause in the policy did not exist, because he is assured beforehand that in consideration of his premium that solemn warranty will not be practically enforced.

To say that a man in this condition is not insured, is nonsense; any insurance company that refused to make the so-called "loan" could be successfully sued, the complaint sounding in fraud and deceit. Indeed, recourse need not be had to a pleading in tort, for the real contract is not expressed in policy and riders. The actual and enforceable agreement is to pay the loss, provided it be always called a "loan." To say that what one must pay and does pay, parts with for a consideration, and can never recover from the recipient, is a "loan," insults understanding. Unless shams are loved for themselves, they must be encouraged for a reason. Such reason exists here; i. e., there has always been a settled hostility to the Erie & Western Case among the lower courts.

Nor do I suppose that all the shams above described were not patent to Wallace, J., when he wrote in the Bradley Case. It never needed Mr. Ogden's admissions to enable that judge to see what he wished to perceive behind the machinery of misbranded papers. There has never been any desire to pierce through pretense to truth, and that which defeated the carrier's defense has been almost uniformly viewed with approval. But Wallace, J., saw that the time must come when the truth would come before some court, and how far he was prepared to go is shown in 153 Fed. 353, 82 C. C. A. 429: "It is not important that the [insured] may not have expressly consented to receive the payment as one not made by the insurance company in recognition of its liability. It suffices if the insurance company did not intend to recognize its liability." And again: "The parties were at liberty to agree that the payment * * * should be regarded as a loan or as a gratuity."

Even on the papers the learned court found the word "loan" a little difficult; gratuity certainly goes far enough. Of course the assured will agree to any form of papers which gets him his money quickest, so that it has been solemnly held in this circuit that, whatever the payment is called, whatever the label put on it, controls, at least sufficiently to close the mouth of the carrier tort-feasor. Mr. Ogden assuredly put on the labels, he has doubtless read the cases, and what his companies can never recover is consistently called a "loan," and at present this seems enough to make it a loan for legal purposes.

The damages and costs are recoverable against shipowners and charterers—the latter, however, only if execution fails against ship and owners.

The first inquiry is as to the value of the Luckenbach in her injured condition in May, 1912. The libel was originally filed for $60,000, and the vessel was discharged on a stipulation for value for that amount. The next month the ad damnum of the libel was raised to substantially the amount proven and admitted at this hearing. Several months later the claimants and owners filed their answer, claiming limitation and asserting a value of $60,000.

No effort was ever made to reseize the vessel or get further security. There never was an appraisement of the vessel herein, and no evidence as to her value has been introduced by the parties, who now object to a $60,000 valuation. So far as opinion evidence goes, it is all to the effect that $60,000 was her value; the acts of the objecting parties confirm that view. The history of the vessel is that she was first the Zaandam of the Holland-American Line, then the Styria, and finally, about ten years before this disaster, the Julia Luckenbach. These names are so familiar in the records of this court that judicial notice might almost be taken of the fact that she was a

very old vessel, built of iron, which obtained an American registry under the wreck statutes, and cost about $80,000 10 years before her owners valued her at $60,000. She was wholly lost at sea about eight months after the injury which gave rise to this litigation, and was then insured for $100,000. In 1909 Mr. Frank S. Martin appraised her at $70,000. On the whole, I am of opinion that the evidence is overwhelming that $60,000 was full value for her in May, 1912. The amount of insurance is evidence of nothing but how large a premium owners were willing to pay to insurers who wanted the money.

In May, 1912, the Julia Luckenbach was, and had been since May 31, 1911, under charter to the Insular Line. By that charter party the steamer was to be placed at the disposal of the charterers on said May 31st, being then "tight, staunch, strong and in every way fitted for the service." The charter also contained the usual provision that the owner should "maintain [the steamer] in a thoroughly efficient state in hull and machinery for and during the service," and was signed "Estate of Lewis Luckenbach, per Edgar F. Luckenbach, Trustee." By the pleadings it is admitted that the Lewis Luckenbach estate did not own all the steamer, and that the charter party was made by Mr. Edgar F. Luckenbach on behalf of all the owners. All the owners, having been impleaded, have appeared and made the foregoing admission. The charter party is therefore regarded as the contract of all the owners through their duly authorized agent and managing owner, Mr. Luckenbach.

The libelant shipped its sugar under a bill of lading issued by the Insular Line. It is admitted that, under the findings of the court heretofore made, that bill of lading affords no defense to libelant's demand. It follows that since (as has been found) the loss complained of was caused by unseaworthiness of the Luckenbach, existing at the beginning of the voyage from Porto Rico to Philadelphia, the libelant must recover in rem up to the stipulated value of the vessel, and obtain the overplus from the Insular Line, which in turn has recourse against the impleaded owners of the steamer, unless said owners can obtain the limitation for which they now move.[5]

It has been affirmatively shown that the owners of the Julia Luckenbach were not privy to, nor had they knowledge of, her unseaworthiness. The meaning of these words has been sufficiently considered in Quinlan v. Pew, 56 Fed. 111, 5 C. C. A. 438. They failed to use due diligence in keeping their vessel seaworthy, because the competent men whom they employed to supervise and inspect the steamer so failed, within the stringent rules laid down by the courts. Perhaps it is more accurate to say that their own diligence was unavailing, under the law.

But it does not follow that, because errors, omissions, or mistakes were made by their properly selected servants, they must stand ultimately responsible in solido. Primary liability is to be imputed to them, but neither privity nor knowledge is to be so imputed. It is, indeed, admitted that owners' liability should under the statute be limited to the value found, were it not that such owners made a personal contract when Mr. Luckenbach signed the charter party. From this fact, and this alone, under The Loyal, 204 Fed. 930, 123 C. C. A. 252, and Benner Line v. Pendleton (C. C. A., June, 1914) 217 Fed. 497, 133 C. C. A. 349, it is confidently urged that limitation must be denied.

Ruling decisions must be followed, as long as their authority is unimpaired, but the frank expression of opinion is a professional right. I am respectfully, but firmly, convinced that The Loyal, supra, was rightly decided, for the reason given by Ward, J., viz.: The owner had not shown absence of privity or knowledge. But the reasons advanced in the prevailing opinion of Noyes, J., asserted to rest on the language of Great Lakes Towing Co. v. Mills Trans. Co., 155 Fed. 11, 83 C. C. A. 607, 22 L. R. A. (N. S.) 769, have led to the judgment entered in Benner Line v. Pendleton, supra.

---

[5] The question whether owners other than Mr. Edgar F. Luckenbach are or are not entitled to limit liability has not been argued. Owners' counsel have assumed that each owner is ready and able to pay his appropriate fraction of the loss, if limitation as for a single owner is denied. The case, therefore, is considered as though there were but one owner and he had personally signed the charter party.

FEDERAL REPORTER

That a shipowner cannot limit for the consequences of his own fault or

That a shipowner cannot limit for the consequences of his own fault or neglect is elementary, for no such act or omission can be conceived without fixing such owner with either privity or knowledge, or both. That he cannot escape fulfillment of his own contract has been often held (Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct. 27, 56 L. Ed. 110, and cases cited), but never until Benner Line v. Pendleton, supra, was such a contract as a charter party considered as a contract preventing limitation.

The Great Lakes Towing Company Case arose out of a written agreement whereby respondent promised to pay libelant for (inter alia) "wrecking or bottom" work. Such work was done to a vessel of respondent, which nevertheless became almost a total loss; whereupon respondent endeavored to limit payment to the value of the remnant of its vessel. It was held upon abundant authority that the payment of a debt formally contracted for, could not be thus avoided by the contractor. Every case cited, or to be found before the Great Lakes Towing Company decision, and laying down the doctrine that a shipowner cannot limit for his own contract, shows the same kind of contract, viz.: An agreement to pay money, in such wise that an action in debt or assumpsit would have laid therefor.

There is no case before The Loyal, supra, where an owner, free of privity or knowledge, was refused limitation because he personally made a contract which had to be performed by the ship, which contemplated and required service by the ship, as a prerequisite to pecuniary reward. Nor indeed is The Loyal such a case on its facts, but the language of the court (204 Fed. 932, 123 C. C. A. 252, especially) invites to the belief that signature of an agreement to furnish a ship, not only raises the irrebutable presumption of an agreement to furnish a seaworthy ship (which no one doubts), but makes the signer liable in solido and without limitation for all the consequences of unseaworthiness, even though he employ the best men, spends all the money demanded, and is himself so unskilled in seamanship and shipbuilding as to be personally unable to ascertain the facts which condemn him to liability.

Indeed, it is not seen (the statute of frauds perhaps aside) why a written agreement or contract is necessary; the same consequences would apparently flow from a verbal charter. For this doctrine the case relied on (Great Lakes Towing Co. v. Mills Trans. Co., supra) is not authority. To make it so the facts must be inverted. If the libelant in that case had without privity or knowledge of defects furnished an unseaworthy tug, whereby respondent had received damage, there is nothing in the language of the court to show that limitation would have been refused on account of the existence of the contract.

Lurton, J., as a Circuit Judge, was of the court which decided the Great Lakes Towing Co. Case. When he referred to it in Richardson v. Harmon, supra, he said that the construction of the statute made in that and other cases "harmonizes with the policy of limiting the owner's risk to his interest in the ship in respect of all claims arising out of the conduct of the master and crew, * * * but leaves him liable for his own fault, neglect, and contracts." To quote this remark, or any of the cases cited by its maker, as justifying the doctrine that every contract without regard to its nature or method of performance, puts the contractor outside the limitation laws is (to say the least) singular. The master and crew of a ship when navigating or otherwise managing the vessel are acting as the agents of the owner in the fulfillment of that owner's contract. There is no magic in the word "contract," nor in the office of mariner; the logical reason why the owner is not deprived of limitation by negligence of master and crew is that he is necessarily fulfilling his contract by deputy, and the very intent of the limitation acts is to put a measure on the quantum of liability which the owner acting through well-selected agents must assume. It is necessary for an owner to employ master and crew to navigate his vessel, it is just as necessary for him to employ agents, inspectors, shipwrights, and the like to inspect his vessel in order to ascertain her condition before the voyage begins. The same reason should lead to the same results in both cases.

But the matter has been considered before now and in this circuit. The petition for limitation of the owners of the Republic was denied by Benedict, J. (In re Myers Excursion & Navigation Co. [D. C.] 57 Fed. 240, 242), because

the vessel was unseaworthy. The court said: The owners "are chargeable with knowledge of what they might have known, and what they were bound to know, because of their obligation to provide a vessel fit for the employment to which it is put. An owner of a ship cannot be permitted to free himself from an obligation of this character by remaining in ignorance of what it was within his power to know." The owners of the Republic had made no written charter party; they apparently operated their boat themselves, but if there had been a written charter party into which to read a warranty of seaworthiness, this language of Benedict, J., is exactly the doctrine of Benner Line v. Pendleton.[6]

In the Circuit Court of Appeals (In re Myers Excursion & Nav. Co., 61 Fed. 109, 9 C. C. A. 386) Wallace, J., pointed out that the ground of decision below was "an implied warranty on the part of the [shipowner] that the barge was reasonably fit for the service for which she was chartered." This doctrine was not approved of, but in affirming the judgment it was said: "The warranty of seaworthiness which is always implied on the part of the shipowner holds him to the obligation of providing a vessel which is in all respects reasonably fit for the voyage and employment in which she is to engage. Yet there may be a breach of this obligation without his knowledge, and without his personal negligence. He may have employed a most competent expert to make all necessary examination of the vessel just prior to the voyage, an expert possessing skill and experience far beyond his own, and the expert may have failed to exercise sufficient care to discover defects which ought to have been found. It would be a hard construction of the statute which would deprive the shipowner of protection under such circumstances."

Later the same court laid down as an established rule (The Tommy, 151 Fed. 573, 81 C. C. A. 53) "that where the owner has provided a suitable person or persons as his agent to inspect, or provide for the proper equipment of, the vessel, he is not deprived of the benefit of the statute limiting liability by proof of negligence of such agent, where he has had no notice or knowledge of such negligence or resultant defect."

These citations seem sufficient to justify the assertion that the officers and crew of a ship are not the only agents of an owner who may plunge him into liability, but only to the extent of ship and pending freight, and to show it as old doctrine that an implied warranty of seaworthiness does not of itself defeat limitation. Yet the Benner Line Case puts liability without limitation flatly on the ground of the existence of a contract containing that very implication, for the court concedes that the owner in that case "thought [his vessel] was in a seaworthy condition at the time she started on her voyage," and does not advert to any evidence whatever tending to show absence of privity or knowledge.

It seems, therefore, that the last judgment of the Circuit Court of Appeals for this circuit perceives a difference between an implication of seaworthiness arising from soliciting freight or passengers, and the same implication arising from a written charter, and it certainly holds that the ordinary charter party not only contains an implied warranty of seaworthiness (which is of course), but prevents the maker of said charter party from even offering to show that said unseaworthiness arose without his privity or knowledge. This is equivalent to holding that every shipowner who signs a charter party (or perhaps charters his vessel orally) is conclusively presumed to be privy and knowing to every detail of his vessel's construction, equipment or apparatus which may affect seaworthiness.

In the case of The Loyal there was no charter party, but an agreement which permitted, if it did not require, the employment of any convenient lighter. There is nothing in opinion or evidence to show whether the respondent used the same lighter once or many times.

In the Benner Line Case the charter party was for a single voyage, the unseaworthiness developed upon that voyage, and the charter maker was held for the familiar breach. In this case unseaworthiness developed or was

---

[6] The owners of the Republic sold passage tickets, or hired out their barge by the day; that was their business. Why was not every ticket a personal contract, importing a warranty of a seaworthy vessel? Each daily hiring was certainly a charter.

discovered on a voyage which began a year after the charter party was made, and the charter was to endure for three years and seven months.

The Julia Luckenbach had made many chartered voyages before disaster overtook her. It is said that the maintenance clause in the charter party, viz., the owner's agreement to maintain the steamer "in a thoroughly efficient state in hull and machinery," must in the light of the Benner Line Case be construed as an extension of the warranty of seaworthiness at the beginning of the period of hire (admitted to inhere in every charter party) into a warranty of seaworthiness continuing throughout the entire period of the charter, viz., three years and seven months.

There could not be a better example of the extraordinary nature of the rule contended for than is afforded by the facts herein. This charter party was not a demise; the Insular Line were not owners pro hac vice, but within very wide limits they had a right to send the Julia Luckenbach wherever they wished. They could decide as to the character of cargo, and, as has been shown herein, on the character of the cargo largely depends the degree of danger to the vessel.

It is right—and has never been doubted—that the owner who time charters his vessel thereby binds his vessel to whatever lawful freight the charterers put in her, and for the safe transportation and delivery of that freight he should hazard his vessel. But to bind himself to an unlimited liability by such charter party for a period of years is a most extreme contention, and (accepting the Benner Line decision at full value) it depends solely on the meaning to be given to the language of the maintenance clause.

In a case where the demand of the charterers was far less extreme than that here propounded, this question has been considered. In Giertsen v. Turnbull, Sessions Cases 1907–1908, p. 1101, it was held that a series of voyages under time charter did not come within the stages of voyage doctrine of The Vortigern, [1898] Pr. 140, and also that in a time charter "the implied warranty of seaworthiness was complied with when the vessel was handed over to the charterer in a seaworthy condition at the commencement of the period of hire, and that the maintenance clause of the charter party is inserted merely for the purpose of laying upon the owners the burden and expense of maintaining the vessel during the period of hire in a thoroughly efficient state, including of course the expense of all necessary repairs."

The doctrine of this case has been received without comment or objection by Messrs. Scrutton and Carver. If one accepts, therefore, the doctrine that a shipowner who charters out a vessel unseaworthy at the commencement of the hiring period is liable without limitation, it is not necessary to hold that the ordinary form of time charter here before the court contains an implied warranty of seaworthiness extending through the whole period of chartering.

At the time of voyage begun, therefore, the warranty of seaworthiness of the Julia Luckenbach had (as between charters and owners) been exhausted, and there was no contract between them by which owners bound themselves absolutely to maintain seaworthiness, and also gave up the benefit of statutes which merely embody many centuries of admiralty law.

The motion for limitation is granted.

Kirlin, Woolsey & Hickox, J. Parker Kirlin, and Mark W. Maclay, Jr., all of New York City, for appellant Insular Line.

Peter S. Carter and Charles C. Burlingham, both of New York City, for claimants-appellants.

Kneeland, Harison & Hewitt, of New York City (Lawrence Kneeland, of New York City, of counsel), for libelant-appellee.

Before COXE and WARD, Circuit Judges, and CHATFIELD, District Judge.

PER CURIAM. [1] Judge Hough, in the two opinions delivered at final hearing and on the limitation of liability, has said practically

all that it is necessary to say upon the questions now debated. We may add, however, that we are satisfied that the Luckenbach was unseaworthy as the result of gradual corrosion of the plate at a point where there was no cement or where the cement was cracked.

The contract of carriage was between the McCahan Company and the charterers. The charter not being a demise, the charterers cannot take advantage of the statute limiting the liability of vessel owners.

The cause of the accident being neither an error of navigation nor of management, they are not protected by the third section of the Harter Act.

If the bill of lading contains an exception of unseaworthiness, which we believe it does, the charterers are not protected by the second section of the act, because they have not exercised due diligence in respect to the condition of the steamer.

[2] It follows that the libelant is entitled to recover in full against the charterers, unless the clause in the bill of lading as to its insurance protects them. Under prior decisions of this court (Pennsylvania R. R. Co. v. Burr, 130 Fed. 847, 65 C. C. A. 331; Bradley v. Railway Co., 153 Fed. 350, 82 C. C. A. 426), it does not, and we are not disposed to depart from these decisions. Though the purpose of the insurance company is quite apparent, we can understand a contract of loan which is to be repaid only on a certain condition—e. g., the shipper's recovering against the carrier.

[3] As between the charterers and the owners, the latter are under an express obligation to maintain the steamer in a seaworthy condition. It is not fulfilled by her being seaworthy at the beginning of the charter, or of any voyage under the charter. Our decision in The Benner Line, 217 Fed. 497, 133 C. C. A. 349, holds that the owner cannot limit his liability against this express contract.

The decree should be modified, so as to award the libelant its full damages, payable primarily out of the steamer and the estate of Luckenbach, any deficiency to be paid by the charterer, with interest and costs.