## THE SKIPSEA.

(Circuit Court of Appeals, Second Circuit. December 7, 1925.)

No. 35.

**1. Shipping ⊜132(3)—Ship has burden of explaining damage to cargo in transit.**

Ship, receiving goods in good condition and delivering them damaged, has burden of explaining the injury by showing freedom from fault or neglect, or that damage was due to a peril of the sea.

**2. Shipping ⊜132(4)—Respondent, in libel for damage to cargo, has burden of establishing seaworthiness of vessel.**

In libel for damage to cargo, respondent has burden of establishing seaworthiness of vessel.

**3. Shipping ⊜121(2)—Vessel, though seaworthy, as respected navigation, held liable for damages to onions from sea water and coal dust.**

Vessel, though seaworthy as respected navigation, held liable for damages to shipment of onions from sea water which found its way into coal bunker, and through bilge or seams of bulkhead into hold, where shipment was stored, carrying with it a quantity of coal dust.

**4. Shipping ⊜123—Vessel held liable for damage to crated onions from improper shoring.**

Vessel, carrying only one quarter of her dead weight capacity, which encountered no extraordinary seas, held liable for breakage of crates of onions, attributable to improper shoring.

**5. Shipping ⊜141(3)—Damage to shipment of onions held not due to peril of sea.**

Damage to shipment of crated onions held not due to a peril of the sea; vessel having encountered no rougher seas than might reasonably have been expected.

**6. Shipping ⊜140—Provision stamped on bill of lading held void and ineffective to bar recovery of damages to cargo.**

Provision stamped on bill of lading, "The shippers, being satisfied with the stowage and with the conditions of carriage, release ship from all responsibility for deterioration of the said goods," held void, under Harter Act, § 3 (Comp. St. § 8031), and ineffective to bar a recovery for damage to cargo.

**7. Shipping ⊜131—Measure of recoverable damages to shipment of onions stated.**

Measure of recoverable damages to shipment of crated onions held the limit fixed in bill of lading, less salvage value, if any.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Alvara Boera and another, copartners, against the steamship Skipsea, her engines, etc., the Compagnie Francoise de Navigation a Vapeur, claimant. Decree for claimant, and libelants appeal. Reversed.

Finkler & McEntire, of New York City (Frank I. Finkler and Reuben Greenbaum, both of New York City, of counsel), for appellants.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter, of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. The appellant shipped onions in crated packages from Valencia, Spain, on October 16, 1923, for New York, on the steamship Skipsea. The Skipsea was a steel cargo steamer of 8,150 tons dead weight. There were four holds and two decks, and she was fitted with cargo facilities and two 18-inch cowl type ventilators. Other cargo consisted of raisins, skins and rags. The vessel was only partly loaded, carrying 2,825 tons of cargo, leaving 14 feet of freeboard, and due to this there was ample ventilation. The onions were in good condition when put on board. Bills of lading were issued for the onions, which did not recite the condition; but the officers of the ship, as well as the appellants' witnesses, testified to their apparent good condition. During the voyage, the ship encountered rough weather for about six days. However, whenever the weather permitted, the hatches were off. When the cargo arrived in New York on November 12th, it was found to be decayed and spoiled.

The chief officer of the ship testified that, when he went into the hold after the discharge was completed, he found the bottom of hold No. 2 a "bit juicy," and he noticed that the piles in between decks 2 and 3 were broken down, and that the cargo shifted in holds 2 and 3. The captain stated that he noticed some of the cases had fallen down on the shoulder deck and some were broken. The master, in his protest under date of November 13th, stated that the cargo "had shifted and broken adrift, and a number of packages had become broken and lost contents, and others had been damaged by contact with contents of the packages broken up, and by sea water, which found its way below." A city inspector testified that, of appellants' onions, 2,025 crates, 700 half cases and 120 cases were seized by the board of health as unfit for consumption, due to spoiling, and that there was coal dust damage.

There is testimony to justify the appellants in their claim that a large quantity of onions was smashed and covered with coal dust, and some covered with slime and muck. There was coal dust in No. 2 hold, and many smashed and empty crates, and there is no doubt but that the onions in the 'tween decks and in hold No. 2 were spoiled by leakage of water. The coal dust was evidently mixed with the water. No doubt some onions standing in water were damaged. The contents of other crates, upon which the water had either seeped through or come through from the bilges, were decayed or rotted. Testimony is quite unanimous in indicating black stain. We are satisfied that there was a leak in hold No. 2 and damages to the onions there stowed. It is also sufficiently proven that the onions were damaged by the bilge water. There was considerable breakage in the 'tween decks. Here the cargo was not shored in place, and some of the boxes fell off and were broken. The ship has not satisfactorily explained the cause of the damage here, and we are satisfied that the cargo stowed was not properly secured.

[1-4] The onions having been received by the ship at Valencia in good condition and having been delivered in New York in damaged condition, the burden rests upon the ship to explain this injury and condition, and to excuse itself as an accepted peril of the sea, or that it was free from fault or neglect. The appellee must assume and bear the burden of establishing that the vessel was seaworthy. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; Kaufer Co. v. Luckenbach S. S. Co. (D. C.) 284 F. 160. The onions stowed in No. 2 hold were next to a wooden bulkhead separating it from the coal bunker. This bulkhead was apparently not water-tight. Sea water, running out either through the bilge, or through the seams of the bulkhead, or both, found its way into hold No. 2. The result of this combination of water mixed with coal dust explains the damage to the onions found in this hold. Hills v. Mackill (D. C.) 36 F. 703. Although the vessel was seaworthy as respects navigation, the ship would be liable for damages resulting from this cause. The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181. There is testimony that piles of crated onions were broken down. The tiers should have been properly shored up from the start of the voyage, particularly since the vessel was loaded lightly, and carried but one quarter of her dead weight capacity. This explains breakage that took place in between decks, and such breakage as did occur in holds 2 and 3. There was no extraordinary weather or seas, such as might have been reasonably expected at this time of year. Weather of the character encountered would not have caused destruction to the cargo, if it had been well loaded, and a well-balanced ship was shown. The loss through breakage was due to the shifting of the cargo, and this is attributable to the negligent manner of shoring the cargo. The Frey (D. C.) 92 F. 667; The Mississippi (D. C.) 113 F. 985.

[5] The vessel took a southern route and covered the distance in 18 days. It is true that she encountered rough seas, so that she rolled and pitched considerably; but at this season of the year such gales and seas were to be expected in the Atlantic waters. There was no peril of the sea, as that phrase is now understood. The Julia Luckenbach, 235 F. 388, 148 C. C. A. 650. There is testimony in the log entry that the storm on November 2d tore off a tarpaulin, but it cannot be considered that this was so unusual a circumstance as to excuse the carrier, upon the theory that the damage was due to perils of the sea. The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688; The Jeannie, 225 F. 178; The Rosalia (C. C. A.) 264 F. 285.

[6, 7] There was stamped on the bill of lading: "The shippers, being satisfied with the stowage and with the conditions of carriage, release the ship from all responsibility for deterioration of the said goods." This would not prevent recovery in view of section 3 of the Harter Act (Comp. St. § 8031). The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; Andean Trading Co. v. Pacific Steam Nav. Co. (C. C. A.) 263 F. 559. A stipulation that undertakes to exempt the ship from loss or damage arising from its negligence is void as against public policy. It is an effort to indirectly exempt itself from liability which it cannot stipulate directly. Calderon v. Atlas S. S. Co., 170 U. S. 272, 18 S. Ct. 588, 42 L. Ed. 1033; The Turret Crown (C. C. A.) 297 F. 766; The Hadji (C. C.) 20 F. 875. The appellants should have recovered below for damage to the cargo in hold No. 2, due to the mixture of coal dust and water. They should also have recovered for such breakage as took place in the between decks and such breakage as occurred in holds 2 and 3. The measure of damages is the limit, fixed as 300 francs per package, in the bill of lading, less the salvage value of the onions, if any, which were damaged.

Decree reversed.