## THE FLORINDA.

District Court, S. D. New York. August 29, 1927.

**1. Shipping ⬅123(1)—Ship held liable for damage to shipments of onions, due to improper stowage.**

Ship *held* liable for damage to shipments of onions, arising from shifting of crates, due to improper stowage, which prevented proper ventilation.

**2. Shipping ⬅123(1)—Ship held liable for damage to onions from leakage of grape juice.**

Ship *held* liable for damage to onion cargo from leakage of grape juice in old barrels stowed above them.

**3. Shipping ⬅121(2)—Ship held liable for damage to cargo of onions on ground that she was unseaworthy.**

Damage to shipments of onions on a three weeks' voyage from Spain to New York *held* caused by heat due to shifting of cargo and unseaworthiness of the ship for the carriage, in that she was not equipped with sufficient ventilators when, as during most of the voyage the hatches were kept closed owing to her low freeboard, which permitted the seas to wash her deck, though no unusual weather was encountered.

In Admiralty. Suits by Simon Saitta, doing business as Saitta & Jones, by Auctions Sales Company, by Abe Rosenblum, and by Henry Schnell and Samuel Schnell, doing business as H. Schnell & Co., against the steamship Florinda. Decrees for libelants.

Joffe & Joffe, of New York City (Joseph Joffe, of New York City, of counsel), for libelants.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. de Grove Potter and John J. Heckman, both of New York City, of counsel), for respondent.

KNOX, District Judge. Libelants, holding bills of lading for certain shipments of onions, amounting to about 30,000 packages, that went on board the steamer Florinda, at Denia and Valencia, bring these suits to recover for damages sustained by the merchandise while en route from the ports of origin to New York. The vessel's voyage began at Balboa, Spain, on October 9, 1923, and ended at this port on November 13, 1923. The onions went into the vessel's holds about October 22d and 23d. They were in transit, therefore, about 22 days. The several suits were consolidated and tried as one.

The Florinda is a small vessel having a total length of 290 feet, a beam of 42 feet, and a depth of 20 feet 7 inches. Her tonnage is 2,078 gross, and 1,300 net. At sea, the ship had a draft of 16½ feet. She is equipped with three holds, each having a 'tween deck. The holds have a total of five main deck hatches. Cargo space forward of the engine room is divided into two holds, each of which has a separate hatch. A third is over the division line of the holds, and through it cargo may be placed in either. No. 1 or No. 2 hold. Abaft the engine room, there is but one hold with two hatchways. A water-tight iron bulkhead separates the two forward holds. The steamer is equipped with twelve reducing type cowl ventilators, two leading to No. 1 hold, four to No. 2, and six to No. 3. The diameter of each ventilator as it passes through the main deck is 16 inches, and that of the air passages extending through the 'tween deck is 9 inches. There is some dispute as to how heavily the vessel was loaded; the captain saying that he had room in the main deck holds for about 4,000 more small crates of onions than were carried, while one of the consignees testified to his presence on the steamer when the hatches were opened, and added that the steamer was low in the water and loaded to the top. He states that he stepped to her deck directly from the dock at which she lay. Another witness, called by one of the consignees, also declared the vessel to have been low in the water.

In addition to the onions and some general cargo, the ship brought over a quantity of grape juice in barrels. On the outturn, a number of these were found to be warped, swollen, and leaking, with the contents bubbling. Part of the leakage had occurred while the vessel was at sea; and, as a result, a number of packages of onions were stained and unmerchantable. But a more serious cause of injury was decay, and it had affected a very large percentage of all the onions on board. The decay was described as being slimy soft rot. It had manifested itself on the onions in varying degrees, ranging from a softness at the neck of some to a complete breakdown of the vegetable structure in others. The decay had taken hold of the onions so completely that a substantial portion (some 35 or 40 per cent.), of the cargo was condemned by the health authorities, and was taken to sea and dumped. Some slight damage also seems to have arisen from mechanical injuries. These consisted of cuts and bruises. An entry in the vessel's log of October 28, 1923, reads, in part, as follows:

"During the entire day's run, the vessel is rolling heavily, breakers coming on board uninterruptedly. It is feared that the cargo may have shifted. * * * *"

To this, the following note was appended: "Having opened the hatchways for the ventilation, we note that the cargo has shifted, and that some cases have been crushed. As to any damages that may be found to exist in the cargo, I disclaim any liability, as they are not traceable to any fault of the crew.          J. Simon Garay, Master."

During the trip to New York, the Florinda undoubtedly experienced some rough weather; her master saying that he had never had weather so "trying" for "the opening of hatches when traveling with fruit." Nevertheless, there was nothing about the voyage that can be said to have been "catastrophic," and, when a vessel so small, and so heavily loaded as to have a free board of but 6 feet and 9½ inches, after making all allowances, is making a transatlantic trip in November, she has every right in the world to expect her deck to be frequently washed with water, and to be faced with the necessity of sailing with closed hatchways. The log contains but two entries with respect to the hatches, one of which has already been quoted, and the other, under date of November 4, 1923, being as follows:

"* * * At dawn the wind veers to the S. and blows stiffly and we meet with N. N. W. E. & S. seas which cause the vessel to become unmanageable. During this time the hatchways are kept closed, it being impossible to open same to ventilate the fruit owing to the breakers that come on board. * * *"

The log contains no reference to the trimming of the ventilators. The master, however, testified that they were given constant attention. At the same time, he admitted that, with the exception of three days, the hatches were kept closed during the entire trip. The chief officer's testimony was to the same effect. The captain also stated that, when the onions were stowed, three or four open spaces running fore and aft, as well as thwartships, were left between piles of onion crates so as to provide for air circulation. It seems as though these spaces might not have been left in the 'tween decks, but there, says the master, a space was left between the top of the piles of onions and the under side of the deck. The spaces between the stacks of onions were from one to one and a half feet in width. The supervising stevedore, who had charge of the unloading, also testified to the existence of air channels in the stow, but his evidence, taken as a whole, was so inconsistent, and given in such manner as to lead me to believe that he knew but little of what he was talking about. And, if the cargo shifted, as to which there can be no dispute, the probabilities are that the air channels were partially, if not wholly, filled with crates of onions from out the stow. This, of course, would leave open spaces, roughly corresponding in size with the channels that were filled, but there is no assurance that the space so left would admit of a circulation of air that would ventilate the cargo.

The foregoing preamble, lengthy as it is, seems necessary to a discussion of the claim of libelants as to the cause of the decay of the onions, viz. insufficient ventilation; and one of respondent's chief defenses thereto, viz. disease in the vegetables.

Before taking up this branch of the case, it is well, perhaps, to dispose of any damage arising from the shifting of cargo, and the leakage of grape juice.

The bills of lading now before the court, as in the case of the Skipsea (C. C. A.) 9 F. (2d) 887, do not recite the condition of the onions when they went on board the Florinda. The first officer on his examination was asked:

"Did you examine the onions (at the time of loading) to determine their condition?"

His answer was:

"Apparently they are supposed to be good when they are shipped; otherwise, if they are in any bad condition, of course, and cannot be, I have set them aside—I reject them."

Inquiry being made as to the mate's examination, the reply was:

"Only by the simple appearance, and, when out of the way, I set them aside."

None of the crates were set aside, and the inference is plain that the mate saw nothing that caused him to believe that the onions were not in good order and condition. Furthermore, the witness Monton, whose deposition was taken by libelants, and who inspected the shipments moving to Schnell, said that:

"The onions looked sound and bright, in good condition and good shape, as they are usually to stand a journey to the United States."

[1] From the evidence supplied by this witness, and the first officer of the vessel, I am under no difficulty in finding that the onions were in apparent good condition at the time of shipment. From the testimony of the stevedore, who had charge of unloading, to the effect that the tiers of onions were not blocked so as to prevent shifting, and from the fact that the stow actually shifted, and upon consideration that weather and water conditions were not such as to amount to a peril of the sea, I think the vessel should be

held liable for the damage to the onions which is attributable to the disarrangement of the stow. The Skipsea, supra; The Frey (D. C.) 92 F. 667; The Mississippi (D. C.) 113 F. 985.

The grape juice was in secondhand oak barrels. These were stowed three high, bilge and cantline, bung up, bilge free on two-inch dunnage in No. 3 'tween decks. The lower hold contained onions, and it was onto these that the grape juice leaked. Apparently, the 'tween deck was not water tight, for there was not enough leakage for the juice to have splashed down the hatchway from the 'tween deck to the lower hold with the pitching of the ship.

[2] The bills of lading provide that the ship is not responsible for leakage from other goods. Of course, the exception will not excuse the ship from negligence in the stowage of barrels of grape juice. In The Skipsea, supra, the vessel was held liable for injury to cargo arising from drainage, impregnated with coal dust, which passed through a wooden bulkhead into an onion cargo, and I see no reason for not holding the Florinda for leakage that here occurred. The barrels were old, and they were stowed in a place where, if leakage should occur, it was reasonably likely to injure perishable cargo. This is bad stowage. The Arpillao (C. C. A.) 270 F. 426; The C. Lopez y Lopez (C. C. A.) 297 F. 457.

Libelants' claim for shortage of 85 half crates of onions is not sustained. In my opinion, the Florinda brought to New York, and delivered, all of the onions loaded at Denia and Valencia. The apparent shortage of packages is reasonably accounted for by the effort that was made to recondition such portion of the cargo as was worth salvaging. In doing this, the liability to error in count of package was very great, and such error was probably made.

[3] At the trial, respondent exhibited considerable effort to show that the decay suffered by the onions was due to decay arising, not from lack of ventilation, but from bacterial infection with which the fruit was inoculated before it went into the vessel. One of the witnesses called for this purpose was a bacteriologist from the Pease Laboratories. He examined about 200 of the rejected onions on November 26, 1923, about two weeks after the arrival of the Florinda. He found a majority of them to be soft and slimy. Some showed a growth of mold, and a few were sprouted. Most of them, said the witness, were suffering from neck rot, but others indicated the presence of less damaging molds. Being asked as to experiments made to determine the cause and nature of these decays, the witness answered that he had infected sound onions with the mold of onions showing the soft, slimy rot with the result that the vegetable matter of the sound onions was entirely broken down at the expiration of 23 days of incubation in a temperature ranging between 90 and 95 degrees, Fahrenheit. He was of opinion that the condition of the onions on the Florinda could not have been brought about as a result of overheating, but was due to disease. It was his belief that a sound onion, if subjected to 100 degrees of heat for a period of a week or ten days, would suffer no serious harm. Explanation as to the possible presence of bacteria in the onions at the time of shipment was that it might be due to infection acquired in the harvesting, either from the soil, or presence of undue moisture, or improper curing.

Cocks, a cargo surveyor, called by respondent, testified that he cut open a number of apparently sound onions from off the vessel, and found black specks on the central tissues. Other surveyors said that this was not an unusual experience. That such is the fact was demonstrated in the courtroom when an onion, seemingly sound, was cut open, and revealed more or less black fungi within the inner scales near the neck. But that onion had withstood a trip from Spain, and was, with the exception of a small central segment, wholly edible. In passing, it may be observed that a bulletin of the Department of Agriculture, which respondent put into the case, states that neck rot "progresses rather slowly unless conditions are very moist, several months often elapsing before the entire bulb is destroyed. The white varieties decay most readily, while the colored types more often escape it, and when infected show marked resistance to its progress."

Soft rot, as distinguished from neck rot, requires a wound and sufficient moisture in order to gain a foothold in the onion. There is nothing to show that these onions were wounded on shipment. The bulletin calls attention to the fact that the Spanish onion crop of 1923 was smaller than usual, owing to the lack of rain, and the possible presence of disease in the fruit. Gil, libelant's witness, says that the 1923 crop, particularly that grown near Denia, from which most of the onions came, was good. Respondents' contention of inherent vice in the onions was sought to be supported by evidence that one or more of libelants have made claims for

22 F.(2d)—11

large damages to onion cargoes carried on several vessels arriving here from Spain at about the same time as the Florinda. Among them was the Skipsea, supra, the Legie, Cabo Ortegal, and Mar Mediteranneo. In the Skipsea, no recovery was allowed for insufficient ventilation of cargo. But the facts in these cases, whatever they may be, have small, if any, probative effect on the present issues.

At least three of respondent's surveyors maintain that the Florinda was particularly well adapted to the carriage of onion cargoes, and that the stowage, so far as air passages are said to have existed, was good. One of them would not condemn the stowage even though it had no air shafts.

The libelants produced a good deal of proof to the effect that the damage to the greater part of the onions was due to lack of sufficient ventilation. Most of the witnesses so testifying were dealers or handlers of onions. Some of them say that on the discharge of the onions, they were hot to the touch, and that, when the hatches were opened, heat could be seen to issue. This latter fact, in and of itself, is not particularly impressive, inasmuch as under ordinary circumstances, the difference in temperature between the released air of a ship's hold and that of a November day in New York would be likely to give rise to a steam or fog, and it is admitted that the holds were sweating freely. Putnam, a cargo surveyor, who did not see the stow of the vessel, but who examined the fruit shortly after discharge, said it was apparently heated from lack of ventilation. He would not say the vessel was unfitted for the delivery of onions in good condition, but thought, if any considerable quantity were carried, damage might result "owing to the equipment she has for ventilation." When inquired of as to the accuracy of his statement, assuming a proper stow, his answer was that the onions probably would carry "under the most favorable conditions." His opinion as to the presence of undue heat during the voyage was based, not so much on the type of the vessel and her equipment, as on the appearance of the onions.

The public authorities who took part in the condemnation of a portion of the onion cargo expressed the view that their condition was brought about by excessive heat.

From a consideration of all the testimony, there is not much question in my mind that such was the fact. When, after a voyage that cannot be said to have been unusual for the time of year at which it was made, a ship turns out an excessive quantity of heat-damaged cargo, that appears to have been sound on shipment, and which is not shown by satisfactory evidence to have possessed an inherent vice when it went aboard the vessel, the court has before it fairly persuasive evidence that something was wrong with the carrier, or her equipment, and that she was, for such reason, unfitted for the performance of her engagement. In the absence of strong proof to the contrary, the facts justify a finding of unseaworthiness. Under favorable conditions, it may be, as testified, that the Florinda is a good onion carrier; but the very fact that she has previously transported onions in safety is some proof of her unfitness to do so on this occasion. Her claimant makes much of the testimony of the bacteriologist who examined the decayed onions two weeks after their discharge, and who conducted certain experiments in connection therewith; but, in my opinion, that testimony will not support a finding that the decay was in its incipient stages when the fruit went into the holds of the ship.

It is also argued that the Florinda was exceptionally well provided with ventilators. Indeed, my attention is called to the fact that many carriers of perishable fruit have but two or three or four ventilators. My assumption is that such vessels need but few ventilators because of the fact that they are so constructed as to enable them to make their voyages with a reasonable expectation that the hatches will be open for substantial periods of time. But, as previously pointed out, the master of the Florinda was not justified in entertaining the thought of any such possibility. She was constructed so that every ordinary sea through which she passed would wash her deck, and it is easy to understand her log entry to the effect that "breakers" were "coming on board uninterruptedly."

When, therefore, it is borne in mind that the cargo shifted, probably destroying most, if not all, of the air channels, originally placed in the stow, and that the 'tween deck holds were filled with cargo of a more or less heating nature, and that the only available means of ventilation consisted of pipes of the size of those carried by this vessel, one is forced to the conclusion not only that the holds were exceedingly warm, but that perishable cargo, carried therein for a period of more than three weeks, must have been seriously damaged. The ventilation of the main deck holds could have been but little better. The improvement is to be measured by the in-

creased diameters of the ventilators reaching that space. It is manifest that the areas through which air could reach their holds were incomparable to those that would have been provided by hatchways that might have been open through a fair portion of the voyage. Further, it is reasonable to suppose that air circulation in these holds was also impaired by the shifting of cargo, and that this contributed very largely to the decay of the fruit. All of these circumstances, I think, furnish an adequate explanation for the damage that was found. The builders of the Florinda sought to overcome the deficiencies in air circulation to cargo, resulting from her size, by supplying her with an unusual number of ventilators. With the shift in cargo, and the incidents of the voyage, the latter in no way unusual or extraordinary, the effort made to secure adequate ventilation did not succeed. And, in so far as there was failure, the vessel was unseaworthy for her engagement. The bills of lading contained this clause:

"The vessel is not answerable for loss or damage arising from   *   *   *   negligence or fault of pilots, master, crew   *   *   +   or other persons,   *   *   *   leakage, breakage, decay, moisture,   *   *   *   heat of hold, *   *   *   or any other accident,   *   *   *"

—and also the following:

"As to such goods as are liable to deterioration by their nature, such as   *   *   *   onions and other similar products, the vessel shall in no case be answerable for the condition in which the goods arrive at the port of destination."

These provisions, of course, cannot save the ship, if she were negligent, or unseaworthy. With this construction of the clauses, I see no reason to hold them void. Cunard Steamship Co. v. Kelley (C. C. A.) 115 F. 678; The Saratoga (D. C.) 20 F. 869. But, even so, the findings of negligence and unseaworthiness that I feel compelled to make, entitle libelants to the decrees here asked.

I shall sign the same when presented.