## THE MAUMEE.

### (District Court, E. D. North Carolina. September 30, 1919.)

### No. 150.

1. SHIPPING ⬦⟶42—WARRANTY OF SEAWORTHINESS IN CHARTER PARTY.

Where a charter party warranted a vessel to be tight, staunch, and strong, and in every way fitted for the voyage, the owner is bound to see that the vessel is seaworthy and suitable for the service for which she is employed, and is not excused even for latent defects.

2. SHIPPING ⬦⟶42—WARRANTY OF SEAWORTHINESS FOR PARTICULAR KIND OF FREIGHT.

Where a charter party warranted that the vessel was tight, staunch, strong, and in every way fitted for the voyage, which was for the transportation of a cargo of nitrate of soda, the owner was bound to furnish a vessel which was seaworthy for that cargo, even though it was a heavy cargo which put a great strain on the vessel.

3. SHIPPING ⬦⟶141(3)—"DANGERS OF THE SEA."

By the term "dangers of the sea," which were excepted in a charter party, is meant those accidents peculiar to navigation that are of an extraordinary nature or arise from irresistible force or overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Dangers of the Sea.]

4. SHIPPING ⬦⟶58(2)—PRESUMPTIONS IN CHARTER PARTY.

Where a charter party warranted that the vessel was tight, staunch, and sound, certificates of seaworthiness issued by underwriters are presumptive evidence, though not conclusive, that the vessel was in the condition represented.

5. SHIPPING ⬦⟶42, 141(3)—LIABILITY ON WARRANTY IN CHARTER PARTY.

Where a vessel chartered for the transportation of a cargo of nitrate of soda which was warranted tight, staunch, and strong, and fitted for the voyage, sprung a leak so that a large amount of the cargo was lost, *held* that, though the weather was rough, yet, as it was not unusual, the owner must be deemed liable on the ground that the vessel was not as warranted, and cannot escape liability on the ground that the rough weather was one of the dangers of the sea.

In Admiralty. Libel by W. R. Grace & Co. against the steamship Maumee. Decree for libelant.

Robert Ruark, of Wilmington, N. C., for plaintiff.

Barry, Wainwright, Thacher & Symmers, of New York City, and Rountree & Davis, of Wilmington, N. C., for defendant.

CONNOR, District Judge. Libel filed by owners of cargo of nitrate of soda for the recovery of damages alleged to have been sustained by reason of a leak in the steamship Maumee on her voyage from Caleta Buena, Chili, to Wilmington, N. C.

On April 4, 1918, the owners of the steamship Maumee, as agents for the United States Shipping Board, signed a charter party with W. R. Grace & Co., for the carriage of a cargo of nitrate of soda from Caleta Buena, Chili, to the port of Wilmington, N. C., in which the steamer was warranted to be "tight, staunch and strong, well and suf-

⬦⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ficiently manned and victualed, and in every respect fit to perform the voyage."

The cargo was to be "not more than 4,200 and not less than 3,780 tons—English gross weight."

On May 9, 1918, pursuant to the terms of the charter party, the Maumee took on board at Caleta Buena, 40,118 bags for which her captain issued bill of lading.

The libel alleges, and the answer admits, that—

"Upon the 26th day of May, 1918, while the Maumee was proceeding from Colon to Wilmington a leak suddenly occurred which resulted in some sea water entering the after hold of the vessel and doing some damage to cargo stored therein, the extent of which damage unknown to claimants."

Upon arrival at Wilmington, N. C., the cargo was taken from the vessel where, after unloading, it appeared that it was short 328,035 pounds of the value, claimed by libelants, of $13,449.43.

Claimants allege that the leak was caused by the "perils of the sea," within the exemptive terms and provisions of the charter party and bill of lading; that the vessel was, at the time of taking on the cargo and at all other times, until May 26, 1918, seaworthy.

The libel, answer, and evidence disclose that the steamship Maumee is a steel ship 315 feet long, 42 feet beam, built at Hartlepool, England, 1897. She received from the Bureau Veritas, Copenhagen, July 19, 1915, a certificate that she was "in good, efficient working order, classed in first division." She made a voyage from New York to Rotterdam, February, 1918, carrying a cargo of wheat for the Belgian relief, sustaining some injury from heavy weather, and on February 27, 1918, went on dry dock.

She was examined by Myer and Young and surveyed by the surveyor of the Bureau Veritas, who was on the ship every day and prescribed such repairs as he deemed proper to entitle her to a certificate of seaworthiness. His orders in regard to repairs were obeyed. He supervised the work examined and examined her hull. She was then under requisition of the Shipping Board of the United States. On March 8, 1918, the surveyor of the Bureau Veritas issued to her a certificate that she had been examined, "and that all repairs on deck and to the bottom, recommended by the undersigned have been carried out to his satisfaction, etc. Class confirmed."

She returned to New York without accident or injury, and on April 8, 1918, a certificate was issued to her by the chief inspector of the Bureau Veritas, at New York:

"That she was being maintained in accordance with the rules and terms of the certificates which she then carried and which indicates her entry with Class I—3/3 L//. That this class is the highest for ocean service and covers trading on all oceans."

She was ordered, by the Shipping Central Committee, April 2, 1918, to proceed to Hampton Roads and take on a cargo of coal for Panama Canal, and directed to take up with W. R. Grace & Co. for a cargo of nitrate on her return voyage. In accordance with this order, she went to Norfolk, took on the cargo of coal, and proceeded to Colon,

On this voyage she had, "during the first four days, very bad weather"; after that "fair weather" until she reached Colon, April 18, 1918. She did not leak during the voyage. She proceeded, under order, to Caleta Buena with "very fine weather," where, on May 2, 1918, she began taking on cargo of nitrate of soda. Her chief officer says that while at Caleta Buena, and before taking the cargo, he was in charge of the loading and was in the holds every day; that none of the frames of the vessel were broken at that time; the frames were 24 inches apart. The vessel left Caleta Buena May 9th, and reached Balboa May 19, 1918; had "little swell, not much fair weather." She went from Balboa to Colon. Left there May 20, 1919, for Wilmington, N. C. The chief officer is, in respect to the course of the vessel to this point, corroborated by all of the officers and crew. The second mate had been on the Maumee a little over two years; says that he was in the holds every day on the way down; that they were cleaned out; did not leak; that he was in holds Nos. 3 and 4; it was his business to look out for them; none of the frames were broken; he looked at them.

The carpenter testified that he was on the Maumee when she docked at Rotterdam; was on her return voyage to New York, Norfolk, Colon, and Wilmington. She did not leak until May 26, 1918. Took the soundings every morning; found average water there, three or four inches; pumps will leave an inch or two; the bottom of the wells is three feet, six inches below the ceiling of the hold. He cleaned out the holds of the Maumee while she was at Caleta Buena. She was light. There was no break in the frames. Used a small hand-brush. Cleaned down the sides, sweeping the coal dust off. Did this personally. Vessel did not leak at all. The bags containing the nitrate were piled in pyramid form in the holds of the ship. This was the usual and proper way to load it.

The ship's log contains the following entries: ·

"First day had fair weather, took up anchor 6:30 a. m., steering north-northeasterly course, no wind in the forenoon, during afternoon north-north-easterly wind, force 2—wind increased in the night 4. May 20th, cloudy afternoon, clear at night. May 21st, wind increased from 4 to 5—sea was 5—continued all day, steering northeasterly course, wind northeast. May 22d, swell from southeast—ship rolling considerably and shipping quantities of water—all day May 23d, sea is same—5—call that rough sea—ship rolling considerably—shipping quantities of water, weather squally, until noon. Afternoon wind 3—sea 3—in lea of land then. In the afternoon get clear of land, pass' the land again and the ship is pitching heavily, large quantities of water, midnight May 24th, sea was 6, continued all day on 24th—between 8–12.

"Ship is rolling heavily and shipping much water over deck and hatches, weather overcast and squally." Continued until May 26th, when "at about ten a. m. the chief engineer, C. R. Hensen, reported that the water was streaming into the tunnel, apparently coming from the after hold. No. 4 hatch was immediately opened and the chief engineer and chief officer went down and found the hold floating about four feet of water all over; leakage was found by the sound of the instreaming water; it proved to be a broken frame and a rivet hole on the starboard side between No. 3 and No. 4 hatchways, the middle string, say five feet under water edge. Large quantities of water were streaming in, commenced pumping at once and tried to stop the leakage by driving wooden plugs and wedges in between the frames' and the ship's side. Holes were made in the watertight bulkheads between the engine room and No. 3 hold to give the in-streaming water a more free access

to the pumps. At about noon the leakage was so far stopped that the water did not increase any more; kept the pumps going as fast as posssible. During the afternoon the water was observed to be disappearing: good deal of the cargo seems to have been melted away. By further examination it was found out that thirty-six frames on starboard side and six frames on the port side had been bursted at about the middle stringer, probably caused by the heavy laboring of the ship during the voyage."

The chief officer and second mate, immediately upon hearing of the leak, went into No. 4 hold; found water about four feet deep. The captain was there at the time. Could see and hear the water rushing in; saw daylight through hole, rivet hole. Made inspection of ship at once; found broken frames. Could see edges of broken frames; breaks were fresh. Could see the white metal. If old, break would be rusty. Vessel not rolling very much at that time. No water got into the ship until May 26, 1919. Soundings were taken daily by the carpenter and registered. Witness is corroborated by all of the officers and crew who were examined. When the leak was discovered on the morning of May 26th, upon examination, a hole "about the size of a nickel" caused by the loss of rivet was found. Witness expressed the opinion that this was caused by the breaking of the frame, resulting from the "heavy laboring of the vessel." The plate "was out a little," caused by the breaking of the frame. Each plate is riveted onto several frames. So, "if one of the frames broke and broke a rivet, that would loosen the contact between the frames and the plate at the point where the rivet was broken." The frames were not bent in; they were cracked. Neils Anderson, the carpenter, says:

"I think the frames were of sufficient strength. The cause of their break was the heavy laboring of the vessel; that is all I can attribute it to. It was no unusual, but a heavy sea, big swells; such as it is usual to encounter on a voyage. We had it right along every day. The same kind of weather we would have on any voyage; but exceptionally heavy for summer months. It was a beam sea a good deal of the time. That made her roll a good deal more than if it had been a head sea."

The evidence shows that the vessel was free from leaks, or water, until some time during the morning of May 26th. That the frames broke at, or about, that time, causing a rivet which riveted the plate to the frame to break and fall out, leaving a hole which the witnesses estimate to have been about the size of a nickel. It is difficult to fix the exact time during which the leaking continued before it was discovered. Prompt, effective measures were resorted to upon discovery. There is no evidence of negligence either as to the time of making the discovery or the means adopted for stopping the leak. The damage was, to a large extent, sustained before the leak was discovered. Liability of the claimant depends upon the question whether the vessel was seaworthy at the beginning of the voyage. All of the witnesses for claimant, who were on the vessel, concur in their testimony regarding the physical condition at that time. They say that the break was fresh, new; that the frames were not broken before the morning of May 26th. They describe the frames as in good condi-

tion, painted. That there was a little rust on them. The chief officer says:

"You will never find any ship without a bit of rust unless it is brand new. They might have broke if they had been brand new on the same voyage with the same pressure put on them. I cannot say as to that. * * * So far as I know she was entirely seaworthy when she took on her cargo at Caleta Buena. The carpenter says that the break in the frames was fresh, not rusted. When the water got into the hold where the nitrate of soda was stored, it will rust the iron if it was not painted."

When the leak was discovered, the boatswain took the watch down and built a platform, prepared wedges, and the second mate drove them in, between the frame and the side of the ship, just back of the frame, on both sides of the frame. Found 36 frames on starboard and 6 on the port side broken; clean, fresh breaks; still fresh and clear. Could see where the breaks were by the flashlights. He says:

"In my judgment, the heavy laboring of the vessel and the cargo we had caused the frames to break. The plates and frames were riveted together, and the rivet broke. The plate was 'out a little.' * * * If one of the frames broke and broke a rivet that would loosen the contact between the frame and the plate at the point where the rivet was broken. The frames were not bent, cracked, not twisted. * * * I think that the frames were of sufficient strength, but for the heavy rolling of the sea. It was such a sea as it is usual to encounter on a voyage, but we had it right along almost every day. It was an exceptionally heavy sea for the summer months. Not unusual weather, same kind as you get on almost any voyage. Something more than average for summer months. Beam sea—vessel rolls more than if it had been a head sea."

When the ship reached Wilmington, N. C., May 28, 1918, upon request of her captain, a survey was made.

H. Stewart, introduced by libelants, says:

That he was called upon to make a survey of the ship, upon her arrival in Wilmington. That he has been in the business for many years. He began to make the survey with Capt. Edgar Williams, harbor master. Made a preliminary examination when he was called to New York and called on W. N. Harris to take his place. Found a number of ribs, or frames, broken; not simply cracked, but broken. "The condition of the frame was very rusty, looked like it had not been painted for scale in a long time; showed neglect. Nitrate of soda, as a cargo, does not support the sides of the ship. It only comes up to a certain point, and consequently there is not support to the sides of the ship from the inside. The breaking of the ribs would cause the rivets to loosen and cause water to come in. * * * The rivets and frames were badly rusted, heavy scales on them, and that weakens the strength of the material. An inspection within six months would have discovered the condition. We knocked off some of the rust. Saw no evidence that any one else had done so. Made no written report. Knows William Compton and Charles E. Rose; both well known surveyors. Would have good deal of confidence in their judgment."

David H. Scott went on the ship as representative of Mr. Smallbones, first person who went on after her arrival at Wilmington. Went into hold No. 3. Looked at the rivets. Saw empty bags lying in the hold where water shipping through had gotten into the nitrate. Also saw broken ribs. Did not count them. They were very rust eaten. Examined them in company with the mate. Know Finley. He is a competent surveyor. Witness has been engaged in shipping in Wilmington ten years. Been around shipyards since he was a boy.

Joseph S. Newton holds a master's license for several years. Was present during unloading of the Maumee. Saw her ribs. All of them were very rusty. Any one could see that they were rusty, unless he was blind. The bags of nitrate were piled pyramid. That is the usual way in which they are stowed.

W. N. Harris had been a surveyor of ships for many years. Acted for Lloyds at the port of Wilmington. Is now clerk of superior court and one of the port wardens. Went on board Maumee. Made examination of her holds. The ship showed a general rundown condition. There were quite a number of rivets (ribs) broken on the port side, in hold No. 3. They were very badly rusted. "The ship was very badly rusted all around the beams and all around the hatch combings, and what we call runways, and in fact the ship was generally rundown and showed lack of attention. The ribs were badly rusted. The effect was that, when a sea struck against the side of the ship, and a heavy cargo in the bottom such as nitrate of soda, it runs in the hold of the ship, and when a heavy sea would strike her it would cause the ribs to break. The pressure of water on the outside, in my opinion, caused the ribs to break. * * * There was some corrosion. Could be seen. Ribs were rust eaten."

James S. Williams, one of the port wardens, at Wilmington, also contracting stevedore, contracted to unload the Maumee:

"Went on her with Mr. Harris. Was called upon by the resident agents of the ship to make an inspection of her to ascertain whether she was seaworthy, after cargo was taken out, to proceed light to another port. Was on board before the cargo was taken out, and while it was being taken out. Between 30 and 40 ribs were broken on the starboard side and less number on the port—8 or 10. They were corroded, rusty, very badly rust eaten. The fact of the matter was, the ship was in bad condition, but I didn't make any thorough inspection of any part except the part where they had the trouble. The rust had eaten into the ribs to an appreciable extent, so as to diminish their strength or thickness. Did not see any evidence of their having been painted recently, nor of the interior part of the ship at all. Did not see any evidence of chipping of the ribs indicating inspection. Ship looked like it had been carrying kainitt or sulphur ore. Ship did not look like she had proper care taken of her. There was nothing to prevent a man seeing the condition if he inspected the hold of the ship. There was no covering and nothing to prevent seeing the rust and corrosion. From an observation of that aft hold it did not look like it had been painted in a year at least, or perhaps a greater length of time. The ribs on the inside of the ship. There were no boards at all between the sides of the ship and the cargo hold. In my opinion the sides of the hold had not been painted in a year; beyond that I cannot say. * * * Made a very careful inspection of her before we issued that certificate. Was satisfied after the examination that it was perfectly safe for the Maumee to proceed in ballast to a northern port for permanent repairs. Iron vessels will always corrode, more or less. Cannot very well prevent it. There is always some corrosion and some depreciation in the frames of any vessel that has been in service for some time. A fair test is to say whether there is a substantial amount of strong metal left in the frame. * * * I made a particular examination of the ribs in the part where the damaged cargo had been."

Libelant introduced Chas. E. Ross, naval architect and engineer; consulting engineer and surveyor, since 1889; graduate of the University of Pennsylvania:

"Has examined a very large number of iron vessels; averaged one a day. Have surveyed large number for United States Shipping Board. Made a survey for owners of vessel in company with Mr. William Compton; made a written report. Examined the log of vessel and took extracts from it, showing that she 'had very heavy weather on certain specified days and that damage had been sustained.' * * * We went down in holds Nos. 3 and 4. Found that 36 frames along starboard side were broken. In some instances both cracked and fractured. The line of fracture was directly in the way of the middle string of the vessel, roughly speaking, about two inches above the line of the stringer, would vary a little bit, following the line of the shear of the vessel. On the port side there were eight frames broken. The same general description applies there. The forward plate of the after peak tank—at the extreme end of the vessel—about where it joins the second stringer was cracked about on the same line of the stringer. On the line from the side of the tank, double bottom tank, it does not go all the way across from shell to shell; it stops a distance of three or four feet from the side of the vessel, and there is a margin there that connects the skin proper of ship by means of brackets or knees or rivets. A large number of these down below the top of the flood line were loose and started; think 45 of these rivets. The margin brackets on the starboard side of the after hold were loose and started. These rivets did not go through the shell of the vessel. * * * They were the connection that connects the frame to the shell. It was not possible for any water to go through these rivets into the hold. In addition to that, in the afterhold on the starboard side of the vessel, there was one frame rivet that was broken off between three and four hatches, about midway of the hold. Some wedges had been driven between the shell of the vessel and the heel of the frame.

"The breaks in all of these frames were of very recent origin. In my opinion they occurred as of the same time, all of the breaks and broken rivets at the same time. The large number of frames that were broken in consecutive line, the broken rivet, the nature and extent of the damage, breaks were all new breaks, one rivet missing from a plate in the side of the vessel portion of the rivet that goes through the shell plate was missing; the portion of the rivet that goes through the frame was there. I had the wedge taken out. Looked at the rivet that was broken off. The function of the rivet to hold the frame and plate in joining them together. It was a new break; was not wasted away or a deteriorated rivet. On the frames there was some corrosion, some parts a considerable amount of corrosion. The body of the metal had not been seriously reduced in the way of these breaks referred to. It was recommended that 36 frames on the starboard side be repaired by fitting and back bars and eight frames on the port side. In my judgment it was not necessary to take out any of the fractured frames and put in new ones; not so much deteriorated as required them to be taken out. There was considerable amount of strength left there, sufficient in my opinion. I could have condemned the frames but did not. We all concurred in that opinion; no other leak of any magnitude that I saw. The frames were not corroded to such an extent that, in my judgment, had the fractures not been there, as to render the vessel unseaworthy. From the conditions which I found, it is my opinion that stress of weather caused the frames to break. The breaking of the frames might have a tendency to break the rivets—removing the support behind—the rivet which I found broken was just behind the broken frame. Did not see any evidence that the broken rib had been tested. The condition of the rib may be tested by tapping. That is a common method."

William Compton, a surveyor to large underwriters, graduated at Durham Technical College (England) 1900. Went to sea as marine engineer. Was manager of Dry Dock Ship Repair Company. Have surveyed a great many vessels, mostly steel. Surveyed the Maumee in the interest of American Underwriters in dry dock, Baltimore, with Mr. Ross and Mr. Lass. States the condition as described by Ross. He tested the frames with hammer. From this test and appearance,

considered there was sufficient metal there to make repairs which were suggested by owner, representing the underwriters. I felt justified in acceding to that method of repair. In my judgment it was sufficient to make the vessel absolutely seaworthy. Did not condemn any frame. In my opinion when the repairs were effected the underwriters would be protected. I made a careful examination of the frames. Found them in fair condition considering the vessel's age and seaworthy after the repairs were made.

Capt. Edgar Williams had been port warden at Wilmington nearly 20 years. Has been pilot since 1866. Has frequently made surveys of ships. Made survey of Maumee with Stewart. Found some of the frames on the starboard side broken; wedges driven in where the rivet was broken. Considering the age of the ship, the frames were in fair condition. There would be some corrosion with water coming in with cargo of nitrate of soda; not sufficient to render her unseaworthy. Did not complete survey; was taken sick.

Referring to the entry in the log, he says that it indicated that the ship had not encountered any extreme weather, but had encountered "heavy swells." That they were to be expected at sea most any time. "Vessels expect most any kind of weather; they take their chances." The owners and captain know that, when she encounters swells, the ship will roll. Nitrate of soda being a heavy cargo, there is bound to be a heavy strain on the ship when she encounters a heavy swell heaving against the side of the ship. If he encounters swells, there is going to be more strain on the vessel with that cargo than if he had a cargo that filled the cargo space.

[1, 2] Eliminating, for the present, the contention of libelants that the sounding pipe in the afterhold was broken, the determinative question upon the decision of which the case must be disposed of is whether the vessel was seaworthy at the time she entered upon her voyage, within the terms of the charter party. As no claim is made for loss or damage to the cargo, resulting from faults or errors in navigation or in the management of the vessel, the question as to whether the owners exercised due diligence to make her seaworthy, in all respects, as provided by section 3 of the Harter Act, Act Feb. 13, 1893, c. 105, 27 Stat. 445 (Comp. St. § 8031), does not arise. The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241.

We are thus brought to the consideration of the question whether the Maumee was in fact seaworthy and the measure of liability in that respect imposed upon her owners. The discussion by Chief Justice Fuller in The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688, is enlightening upon the question. He says:

"By the charter party, it was agreed on the part of the vessel that she should be tight, staunch, strong, and in every way fitted for the voyage [the same language found in the charter party in this case], and the rule is well settled that the charterer is bound to see that his vessel is seaworthy and suitable for the service for which she is to be employed, while no obligation to look after the matter rests upon the owner of the cargo. * * * If there be a defect, although latent and unknown to the charterer, he is not excused."

The rule announced by Judge Gray in The Caledonia (C. C.) 43 Fed. 681, is quoted with approval, which concludes:

"The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence."

In The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644, the language of Mr. Justice Gray, who heard the case on the circuit, is approved, and it is said by the Chief Justice:

"After renewed consideration of the subject, in the light of the able arguments presented at the bar, we see no reason to doubt the correctness of the rule thus enunciated"—thus rejecting the argument which sought to relieve the owner from liability for damage sustained to the cargo, by reason of latent defects.

The English and American decisions are reviewed, and the conclusion reached that the Circuit Court rightly held that the warranty was absolute. Hughes, Admiralty, 145.

This warranty of seaworthiness is construed to obligate the owner to furnish to the shipper a vessel seaworthy for the purpose and the cargo which she is to take and carry. The charter party in this case is entitled, "Nitrate Charter Party," and the warranty is that she is, "in every respect, fit to perform the voyage hereinafter mentioned"; that is, to receive "at Caleta a full and complete cargo of nitrate of soda in bags, etc." The warranty of seaworthiness, therefore, must be interpreted in the light of the cargo and voyage.

" 'The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport.' This is the commonly accepted definition of 'seaworthiness.' As seaworthiness depends not only upon the vessel being staunch and fit to meet the perils of the sea, but upon its character in reference to the particular cargo to be transported, it follows that a vessel must be able to transport the cargo which it is held out as fit to carry, or it is not seaworthy in that respect." The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65, citing The Thames, 61 Fed. 1014, 10 C. C. A. 232 (Fourth Circuit).

The owner is bound to furnish a seaworthy and properly equipped vessel for the purpose of the voyage. Kent, Com. 305; The Wildcroft, 201 U. S. 378 (388), 26 Sup. Ct. 467, 50 L. Ed. 794; The Jeanie, 236 Fed. 463, 149 C. C. A. 515.

This being the standard or measure of obligation assumed by the owners of the Maumee, it is sought to relieve her from liability for the damage sustained by the cargo in the charter party. The only provision, in this respect, in which we are concerned, is found in the exception of liability for "perils of the sea." In the construction of this clause it is said: "There is a mass of learning and refinement of distinction." Hughes on Admr. 154.

[3-5] The following definition of this exception has been quoted with approval:

"By the dangers of the sea is meant those accidents peculiar to navigation that are of an extraordinary nature or arise from irresistible force or overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence." Tuckerman v. Stephens & Credit Trans. Co., 32 N. J. Law, 320.

Justice Story in The Reeside, 2 Sumn. 567, Fed. Cas. No. 11,657, says: "The mere rolling of a vessel by cross seas is not such a danger."

In The Edwin I. Morrison, supra, the findings of the Circuit Judge in regard to the weather encountered by the ship, were approved. It was said:

"It was for them (the owners) to show affirmatively the safety of the cap and plate; and that they were carried away by extraordinary contingencies, not reasonably to have been anticipated. We do not understand from the findings that the severity of the weather encountered by the Morrison was anything more than was to be expected upon a voyage, such as this, down that coast and in the winter season, or that she was subjected to any greater danger than a vessel so heavily loaded, and with a hard cargo, might have anticipated under the circumstances."

The findings of the judge are set out at length, paragraph XIII, 153 U. S. 205, 14 Sup. Ct. 826, 38 L. Ed. 688.

In The Caledonia, supra, the question upon which liability was made to depend was stated to be:

"Was the vessel at the time of her sailing in a state, as regards the stowing and receiving these plates, reasonably fit to encounter the ordinary perils that might be expected on a voyage at that season from Hull to Cronstadt?"

In The Newport News (D. C.) 199 Fed. 968, Judge Hough says:

"In order to find peril of the sea, the losses sustained need not be extraordinary in the sense of necessarily arising from uncommon causes. Rough seas are common incidents of a voyage, yet they are certainly sea perils and damages arising from them are within the exception if there has been no want of reasonable care and skill in fitting out the ship and managing her."

The log, which the learned judge accepted as true, discovered "violence of the sea sufficient to pick up and throw overboard whole barrels of rosin, of great weight. The barrels were broken and the contents spread over the deck. High seas breaking away rail of coal bulkhead and post of bridge deck. Vessel pitching and rolling heavily, etc." The Ninfa (D. C.) 156 Fed. 512; United States v. N. Y. O. & S. S. Co., 216 Fed. 61 (71), 132 C. C. A. 305; The Giulia, 218 Fed. 744, 134 C. C. A. 422.

In view of these authorities the question comes: Was the damage to the nitrate attributable to "perils of the sea"?

The certificates of seaworthiness held by the vessel are presumptive evidence in her favor and may justly be treated as strong, but not conclusive, evidence, of her condition. The evidence of the master, mate, and other members of the crew, may and should, so far as it relates to specific facts, be taken as true. Conceding this, the question yet remains open whether, in truth, the condition of the ship measures up to the standard fixed by her charter party and the law.

Giving to the certificates issued to her by the Bureau Veritas the weight to which they are entitled, there is a presumption that, at the time of her examination, March 8, 1918, she was seaworthy. This, of course, is subject to be rebutted by competent and credible testimony. She was 21 years of age. The officers and crew are interested in maintaining their contention that they made careful exam-

ination of the holds of the ship at the time she took on the cargo, and their evidence as to what they did in that respect is to be weighed in the light of that fact. Whether they made so thorough and careful examination as the conditions demanded is doubtful. The vessel did not leak at that time, there was "no break in the frames," and the nitrate was "piled" in the "usual and proper way."

It is more diffcult to reconcile their statement that the frames were free from rust, with the testimony of the witnesses who examined her at Wilmington, and the Experts Ross and Compton. There was certainly, on her arrival at Wilmington, May 28th, some rust, some corrosion, on the frames. The testimony of James M. Williams and W. N. Harris, corroborated by the others who made the survey, cannot be rejected. They are men of high character and experience in making surveys of iron ships. Ross and Compton are intelligent experts and men of high character. They concur in saying that—

"On the frames there was some corrosion, some parts a considerable amount of corrosion. * * * It was reduced in sections some, but not seriously reduced in the way of these breaks referred to."

Ross says:

"Could have condemned the frames, but did not. In my opinion the stress of weather caused the frames to break."

Compton says:

"There was rust on the frames. We tested them with a hammer. In fair condition, considering the vessel's age. Rust did not so weaken frames as to render her unseaworthy."

Capt. Edgar Williams, witness for claimant, says that there was corrosion on the frames; "considering age of the ship, they were in fair condition."

James S. Williams made careful examination of the ship for the owners, called on by resident agents, for the purpose of ascertaining whether she was seaworthy, after cargo was removed, to go to another port, light. He says the frames were corroded, rusty, very badly rust eaten. Rust had eaten into the ribs to an appreciable extent, so as to diminish their strength or thickness. Did not see any evidence of shipping, indicating inspection. Iron vessels will always corrode more or less; can't very well prevent it. There is always some corrosion and some depreciation in the frames of any vessel that has been in service for some time, made a particular examination of the ribs in the part where the damaged cargo had been. He is corroborated by Harris, Stewart, Scott, and Newton. I am constrained to find that there was rust on the frames, corrosion, which reduced their strength. This is not inconsistent with the testimony of the crew and other witnesses who say that the breaks were "fresh." I am satisfied that the breaks occurred at the time of, and caused, the breaking of the rivet, which held the plates to the frames. Of course, as said by all of the witnesses, this was caused by the weather which the ship encountered at the time. The experts say that, in their opinion, the vessel was seaworthy notwithstanding the rust or corrosion, and that they did not condemn nor require the frames to be removed, but di-

rected them to be supported in the manner described by them. Notwithstanding these opinions, we are confronted with the fact that some 40 of these frames broke under the conditions described in the ship's log, which are taken to be correctly recorded.

Were these conditions such as to exempt the owners from liability from damages sustained by reason of perils of the sea; in other words, were these conditions so "extraordinary, unusual, of such irresistible force and overwhelming power as could not be guarded against by the ordinary exertions of human skill and prudence," or was the vessel in respect to the frames, or ribs, at the time she began the voyage, in a condition as reasonably fitted her to encounter the ordinary perils that might be expected on a voyage at that season, with the cargo which she carried? Was she strong and seaworthy within the meaning of the warranty contained in the charter party? Until May 22d, she had fair weather, smooth sea. On October 23d, swell; rolling considerably and shipping quantities of water. At midnight of the 24th of May, ship is pitching heavily; shipping large quantities of water; this continued until May 26th, when leak was discovered. The chief officer says:

"It was such a sea as it is usual to encounter on a voyage, but we had it right along, almost every day. It was exceptionally heavy weather for the summer months. Not unusual weather; same kind as you get on almost every voyage; beam sea; vessel rolls more than if it had been a head sea."

The other members of the crew testify to the same conditions. The vessel sustained no other injury than the breaking of the frames. The weather conditions as found by the court in The Morrison, supra, were much more severe than here. The court held that they did not come within the exceptive provisions of the warranty, although the vessel encountered "adverse winds and heavy weather."

In The Wildcroft, supra:

"A severe storm was encountered and some damage was done by salt water finding its way into hold No. 3, because of the tearing away of the tarpaulin over the hatches and washing off the starboard ventilator cover."

This was held a damage caused by the perils of the sea.

In The Tjomo (D. C.) 115 Fed. 919, the vessel encountered "terrific storm of wind and heavy seas, * * * 'a very heavy hurricane,' with wind from 90 to 100 miles an hour." The mate, with ten years' experience, said that "it was the most terrible storm he ever saw." Held within the exemptive terms of the warranty. In the British King (D. C.) 89 Fed. 872, the evidence upon which the court found the damage due to perils of the sea clearly distinguishes this from that case, "the weather was extraordinary, etc."

In The Julia Luckenbach, 235 Fed. 388, 148 C. C. A. 650 (C. C. A. Second Circuit), the District Judge found, and the Circuit Court approved his finding, that the vessel "encountered strong winds and rough seas, so that [she] rolled and pitched a good deal, and shipped water in and over decks. She encountered that degree of strain to be expected in frequent Atlantic weather and no more."

In The Carisbrook (D. C.) 247 Fed. 583, the court found that the

owners had used due diligence to make the ship seaworthy, and the damage was sustained by the management of the crew, and therefore within the provisions of the Harter Act.

After a careful examination of the decided cases, illustrating the views of admiralty courts, respecting conditions which bring instant cases within the definition of "perils of the sea," used in charter parties, recognizing the fact that to a large extent each case is dependent upon the specific facts, I am brought to the conclusion that, in respect to the cargo which she undertook to carry, the frames of the Maumee were, at the time she took it, rusted to an extent which disabled them to resist the ordinary conditions of the sea which should have been anticipated on the voyage; that those which she encountered were not "extraordinary, or such as were the result of irresistible force or overwhelming power which could not have been guarded against by ordinary exertions."

I do not deem it necessary to discuss the evidence respecting the condition of the sounding pipe. It is sufficient to say that I am of the opinion that such injury as it sustained is attributable to accidents occurring during the voyage, and not to any defect in its condition at the commencement of the voyage, nor any negligence on the part of the crew. I am also of the opinion that whatever injury it sustained did not cause or contribute to the damage of the nitrate of soda.

I am of the opinion that the libelants are entitled to recover of the claimant the amount of damage sustained by the nitrate of soda. The statement shows this to be $13,449.43. The quantity of shortage is admitted.

The claimant does not press the suggestion that because the Maumee was, at the date of the charter party, and receipt of the cargo, under requisition of the United States Shipping Board, she was immune from the libel. A decree may be drawn in accordance with this opinion.